## MACARTY et al v. MANDEVILLE.

| 3  239|
| Case 2 |
| 114  463|

Under the spanish law one having neither ascendants nor descendants was under no incapacity to dispose of his property by donation in favor of a concubine. By the Code of 1808, book 3, tit. 2, art. 10, persons living in open concubinage were declared incapable of making to each other any universal donation, or under an universal title, *inter vivos* or *mortis causa*. The prohibition to make any donation of immovables, or any donation of moveables exceeding one-tenth part of the whole value of the donor's estate, unless in case of a subsequent marriage, was introduced by the Code of 1825, art. 1468.

The prohibition by law of donations of a particular character implies the right to make those not within the prohibition.

Where the facts of a case present a double aspect, one of which represents a contract which the law authorizes, and the other one prohibited by law, the contract must be sustained.

APPEAL from the Second District Court of New Orleans, *Canon*, J. *Duvigneaud*, for the appellants. *L. Janin* and *Soulé*, for the defendant. The judgment of the court was pronounced by

MACARTY
*v.*
MANDEVILLE.

EUSTIS, C. J. This case arises under article 1468 of the Code, which provides that those who live together in open concubinage are respectively incapable of making to each other, whether *inter vivos* or *causâ mortis* any donation of immovables, and if they make a donation of moveables it cannot exceed one-tenth part of the whole value of their estate. Those who afterwards marry are excepted from this rule. The plaintiffs are the collateral heirs of the late *Eugene Macarty*, who died in this city on the 25th of October, 1845. They allege that among the property left by the deceased, which has not been inventoried, was the sum of $111,200, deposited in the Bank of Louisiana in the name of the defendant, and withdrawn by her on the 2d of October, 1845, a further sum of $11,000, paid by the deceased from his own money to *Lamothe*, and a slave *Henry*. Several other slaves, and lots and houses in the city of New Orleans are also claimed as forming a part of the succession of the deceased, and are alleged to be illegally in the possession of the defendant, who was the concubine of the deceased. For the recovery of those this suit is instituted. The judge of the Second District Court of New Orleans, before whom this cause was tried, considered that the plaintiffs had not satisfactorily made out their case and dismissed their petition, and they have appealed. In the examination of the voluminous mass of testimony we have been very much aided by the well prepared briefs of the counsel, which have directed our attention to the real points at issue between the parties, the difficulties of which are equally serious and embarrassing.

The deceased, from the year 1796 until his death, lived in concubinage with the defendant, who is a person of color. She is in the possession of a fortune which, taking the estimate of her counsel, exceeds the sum of $155,000. The property left by the deceased, according to a declaration in his will, which was made eighteen days before his death, that it was all his property, amounted to about $12,000. The defence is that all the property in the possession of the defendant belongs exclusively to her, and has been honestly acquired, and is the result of her industry and economy during half a century; and it has been undertaken to account for this large accumulation by legal evidence, and also to give the causes of the modicity of the fortune of the deceased at the period of his death. It is obvious that this attempt involves the histories of both their lives, their habits, their pursuits, as well as their pecuniary means. The plaintiffs have not attempted to deny that the defendant has been *une femme extrèmement laborieuse et économe*. It appears that she had, in all respects, rendered her condition as reputable and as useful as it could be made. Five children have been the fruits of her connexion with the deceased. They were all well educated. Two of the sons are in business in this city, and one is living on his income. The daughters were married and established in Cuba; one of them is since deceased, leaving two children. The state in which she lived was the nearest approach to marriage which the law recognized. and in the days in which their union commenced it imposed serious moral obligations. It received the consent of her family, which was one of the most distinguished in Louisiana, and nothing appears to have occurred to forfeit or to diminish their approbation and good will.

She received, in 1799, a tract of land of three acres front and forty in depth on each side of the bayou of Terre aux Bœufs, and we think it is clear that her family gave her money, the amount of which, at this distance of time, it is impossible to ascertain. There is no difficulty whatever in accounting for

the capital requisite to commence her business of a retailer, which she after- <span style="float:right">MACARTY<br>*v.*<br>MANDEVILLE.</span>
wards followed. The defendant was for several years engaged in the dry
goods business in this city. She purchased from the importers, and retailed
her goods by her slaves and persons who sold for her. She was intelligent,
industrious and skilfull. Her business was extensive and lucrative, and her
credit undoubted. She had a dépot in the parish of Plaquemines, and her trade
extended as far as Donaldsville and even to Attakapas. A few extracts from
the testimony of witnesses, whose means of knowing and character cannot be
drawn in question, will give a proper idea of her position and resources in the
way of her trade.

" *Duncan Kennedy*, witness for the defendant, sworn, says he has been a mer-
chant for more than forty years in this city, from 1806; he was formerly a part-
ner of the firm of *Kennedy & Duchamp.* Witness was a merchant here fourteen
years previous to becoming a partner of *Duchamp.* Witness was in the dry
goods line. Witness sold the defendant a great many goods in 1806, 1807, 1808,
and 1809, and has very often had transactions with defendant; and subsequent
to that, witness has sold many goods to defendant. Witness says that, in 1811,
1812, and 1813, the dry goods business was very lucrative. Witness brought
goods down the river during the war, and realised a good profit. The business
of retailing dry goods, such as the defendant followed at that time, was also very
lucrative. She bought many goods, and sent persons about the streets retail-
ing. Witness saw the defendant when she came to his store to buy, and she
always brought the money to pay; this is all the acquaintance he had with her.
Witness considered the defendant remarkably industrious, and she was con-
sidered so by all persons in the place. Cross examined : Witness says that it
is so long since, that he cannot tell when he last examined the account of
defendant on his books; that defendant was very industrious and honest, and
had credit; she could get any thing she wanted. She could have obtained from
$15,000 to $20,000 worth of goods on credit from witness, as he considered
her honest and industrious. Witness still does business here. After witness'
dissolution with *Duchamp*, he formed the copartnership of *Kennedy, Durel &
Co.* Mr. *Durel's* name is *Michel Valcour Durel.* Witness was not at all
acquainted with *Eugene Macarty* ; knew nothing at all about him."

" *William Debuys*, witness for defendant, says he has known defendant since
1816 or 1817. When he knew her first, she enjoyed great credit and passed
for a rich woman. Witness was a young man at that time, and was salesman
in a commission house—the house of *Peter Laidlaw & Co.*, and witness was
directed to let the defendant have all goods which she wanted. The house was
a wholesale house, and only sold by packages and boxes, and defendant
purchased by wholesale. Witness has known defendant engaged in the dry
goods business up to late years. She did considerable business—the retailing
business, at the time witness was clerk, produced profits. Cross examined :
Witness says that defendant purchased largely, but cannot say to what amount;
and the witness had been instructed by the house that, whenever they received
invoices of fresh goods to make out a copy of the same and send it to the
defendant, which he did, and defendant generally purchased on those invoices
8 or 10 packages at a time, which she divided among other *marchandes* in lots.
Witness knew *Eugene Macarty* by sight. Witness knew him by reputation,
as a shaver. Witness always heard that *Macarty* had nothing; and when wit-
ness was a bank director, he has seen notes put in for discount, drawn by
*Macarty*, for $400, refused."

"*Michel V. Durel:* Witness has known defendant since 1809. In 1811, witness was employed as clerk at *Vincent Nolte's.* He knows that defendant bought considerable goods. At that time the business was profitable then, and is so still, when the persons know how to purchase and sell at retail. Witness knows a person who set up a small retail store, who withdrew from business with $80,000, more or less. The *Pauchons, Tibliers, Valles, &c.,* have made large fortunes by the same means.

Witness says that, in 1817, he was clerk to *Currell, Ure, Donald & Co.,* and that he left there in 1823; that, at that time, defendant purchased largely from that house in partnership with *Mrs. Durel* and others, which goods they divided amongst them and sold at retail. Defendant had an unlimited credit with the house; her account there was a heavy one. Witness means that the amount of goods purchased by defendant at the end of the year was a heavy amount. That, about 1823, witness went into the house of *Dennistoun & Hill,* and remained there until about 1826; they also sold goods to defendant, but defendant did not purchase from them so heavily, as she did from the former house. She had at that time made money, and her business began to flag. Witness says that at that time *Aurore Martin, Agate Fauchon, Mrs. Peuch, Mrs. Durel,* and some few others sold as extensively as the defendant. *Mrs. Peuch* left for France with a handsome fortune, which she made by it; and they have all made fortunes, some larger than others, by this commerce."

That the defendant realized large profits from her business, we think the evidence fully authorizes us in believing. It is proved that she afterwards employed her means in discounting notes, in which she was aided by the experience of *Macarty,* who transacted all business relating to the investment of her money. Since 1825, the notes discounted uniformly bore her signature, in bank large sums of money were deposited in her name, and the property claimed by the plaintiffs appears to us to be in the *bonâ fide* possession of the defendant and exclusively so, without any established connection with the interests of the deceased. That the deceased bestowed time and labor upon the increase of the defendant's fortune is conceded, and that she derived great benefit from his aptitude and skill in usury, is indisputable; but his right to do as he has done, the defendant insists cannot be drawn in question by the plaintiffs.

This is the explanation given of the origin and accumulation of the fortune of the defendant. The weight of evidence in support of it is, we think, conclusive; that is, we think that, from the economical and orderly habits, the good judgment and thrift, which, without any contradiction all the witnesses allow the defendant exercised—from the length of time these qualities have been in operation in one single direction, from her opportunities and acknowledged means, the amount, even supposing it to be what the plaintiffs' insist it is, is not so large as to authorize us in assuming that any portion did not honestly and legally belong to her.

On the other hand plaintiffs contend that, ever since 1825, and up to the year 1845, *Eugene Macarty* has transferred his whole fortune to the defendant by loaning on mortgage, by depositing his funds under her name in bank, and that his object in having them in her name up to the time of his death was to defraud his heirs at law of their rights secured under the Code; that all these deposits, loans and transfers are in fact nothing more than disguised donations, and voidable as such.

It appears that, during the time when her trade was the most lucrative and when she must have made a large portion of her property, her name did not

appear in any bank as a depositary or holder of notes, and we infer that her funds were in the name of the deceased. That any portion of the funds in his name belonged to her at this time is denied by the plaintiffs, but it is asserted that their affairs were separate and distinct, and that the defendant only owned the property which then stood in her name. But we think the weight of evidence is against this position. There is nothing before us showing any settlement of accounts between the parties, nor the state of them; and what was the share of each in the money or funds held by the deceased, or by the defendant, probably was and must for ever be a secret of which they themselves were the sole depositaries, and concerning which we can follow no other guide than the evidence which has been submitted to us.

As far back as 1807 the plaintiffs contend that the means of the deceased amounted in value to upwards of $20,000, and they estimate it as increasing up to 1824. But it must be borne in mind that there is nothing before us on which we can interfere with any dispositions he may have made of his money under the laws which were then in force, and the larger his means were the greater was the probability of his liberality towards the deceased. This fact of the extent of his fortune at that time strengthens, rather than impairs, the defendant's case, by furnishing an additional reason for accounting for her present fortune.

Under the spanish law, the deceased, having neither ascendants nor descendants, was under no incapacity to dispose of his property by donation in favor of the defendant. By the Code of 1808, book 3, title 2, art. 10, p. 210, persons who lived together in open concubinage were declared incapable of making to each other *any universal donation, or under an universal title, inter vivos or causâ mortis.* We have not been able to find any other restriction in the disposition of property imposed on persons living in that condition. From the examination we have been able to give the subject we are satisfied none other exists. The prohibition of donations of a particular character implies the right to make those not within the prohibition. Partida 6, tit. 7, laws 2 and 12. Ibid, tit. 8, law 2. Commentary of Gregorio Lopez on those laws. Institutes of the law of Spain, tit. 3, lib. 2, p. 117.

When we consider the basis on which this defence rests it is obvious that, io order to assail it successfully, the evidence itself must be impungned or weakened by proper and sufficient proofs. Doubts may exist, conjectures may be raised, which it is difficult to explain; but such is the necessary consequence of the state of things between these parties, and the time to which the matters to be enquired into extend. The defendant has not been placed by the plaintiff's evidence in a situation in which she is called upon to explain every transaction of her long life.

We held, in the case of *The Bank of Louisiana* v. *Briscoe,* that where the facts of the case presented a double aspect, one of which represented a contract which the law authorizes, and the other within a prohibition, the contract would be sustained. *Ante* p. 157. The principle is applicable to a certain extent to the facts of the present case, and to the conclusions of law deducible from them, inasmuch as there is no positive proof of any intent to violate the law, the plaintiffs inferring that intent from the facts themselves.

It is contended, on behalf of the defendant, and we think with justice, that there was nothing in the relation of those parties which prevented the deceased from giving the defendant the benefit of his aptitude and judgment in the loaning of money and the discounting of notes, in which it is conceded the deceased was a proficient; nor do we consider it as furnishing by itself, any well ground-

MACARTY
v.
MANDEVILLE.

ed cause for suspicion. To whom else was it natural for the defendant to apply, for the management of her business and the investment of her money? It appears that the notes discounted by the deceased were always put in the actual possession of the defendant, and that when paid they uniformly bore her signature. The discounts were made by the deceased, not under the mask of a power of attorney, but as they would have been made had he been investing his own money or that of others entrusted to him, and the ownership was only disclosed by the signature of the defendant in whose name they were deposited in bank for collection. We can perceive no disguise nor indirection in these transactions, which appear precisely as they would in any fair *bonâ fide* business of the kind; nor do we find any thing, which weakens or renders untenable this defence, in the bank accounts, which for several years are before us: on the contrary they confirm it. The mortgage transactions we think are of the same character.

But what became of the fortune of the deceased? This question it is assumed that the defendant is bound to answer, and that she must be held to explain the modicity of its amount, and to account for its almost total disappearance. It seems to us, when the advanced age of these parties is taken into view, and the status or condition, the education and position of the children of the deceased are considered, that the tendency of his affections and the claims of his children would render them much more probable recipients of the bounty of their father than the defendant, who it is conceded was provided for by her own means. Judging from these causes, which press themselves upon our consideration from their own intrinsic weight, we perceive no reason which renders it probable that the defendant enjoyed the bounty of the deceased to their detriment. But the deceased was owner of a coffee plantation in the island of Cuba, which turned out to be a ruinous concern. Two of his children were established there, and remittances are proved to have been made to them, at different times, from 1822 to 1841, amounting to upwards of $30,000. And supposing that the deceased bore the expenses of his own household, and of the education and establishment of his own children, and the right to do this we do not understand to be drawn in question, the smallness of his means at the time of his death is fairly accounted for, without the aid of the hypothesis of spoliation on the part of the defendant.

The counsel for the plaintiffs, who argued this case in writing, and the argument is very complete, attaches great importance to the declarations of the deceased as to the extent of his fortune. The declarations made at different times, as proved by the witnesses, are contradictory and inconsistent, and we attach consequently no weight to them.

We agree with the district judge who tried this cause, who heard the numerous witnesses who were examined, and had an opportunity of testing the credibility of each and of forming an accurate opinion of the complexion of the cause, that the plaintiffs have not made out their case. On the contrary, from a careful consideration of the evidence we think the weight of it is decidedly with the defence, and that it would not be reasonable to require, under the circumstances, that the defendant should prove more than she has done, considering the remoteness of the origin and length of continuance of the matters involved in this suit. We must let matters stand as the deceased has thought best to leave them. From what is before us, we do not feel ourselves at liberty to declare that the last twenty years of his long life has been a continued cheat, and that he closed it with a falsehood on his lips.

We are not insensible to the appeal made to us in this case, in the interest of morals, religion and social order; and we have, on a recent occasion, reversed the verdict of a jury, vindicated the rights of heirs and restored to them a large estate, which a party had attempted to deprive them of by an indirect donation to a concubine. See the case of *Cole* v. *Lucas,* 2 An. R. 946. At the same time that we are bound to give effect to our laws made in the interest of families, it would be an abuse to bring them in conflict with the right of property, under which the defendant claims the subject of the present suit. She bases her defence on that right, and we find no warrant in the law or evidence for disturbing her in the enjoyment of the fruits of the labor and thrift of a long life. *Judgment affirmed.*