(38 South. 417.)

No. 15,020.

Succession of JAHRAUS.*

(Feb. 27, 1905.)

DONATION OF IMMOVABLES—VALIDITY—CONCUBINAGE.

1. Concubinage imports something more than the mere illicit commerce of a man and a woman; it imports the maintenance of a status resembling marriage.

2. The word "open," in article 1481, Civ. Code, providing that "those who have lived together in open concubinage are respectively incapable of making to each other any donation of immovables," has the meaning of not secret, without concealment or disguise, plain and aboveboard; so that a concubinage maintained under the cloak of an innocent relation, and sought to be kept secret, will not give rise to the incapacity pronounced by that article.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

In the matter of the succession of Celine Jahraus. Action to set aside a will. From the judgment for plaintiff, defendants appeal. Reversed.

Charles Payne Fenner, for appellants. William Stirling Parkerson, for appellee.

PROVOSTY, J. The father of the decedent brings this suit to annul her will, on the

ground that she lived in open concubinage with the universal legatee, the principal defendant, and therefore, under article 1481, Civ. Code, was incapable of making a will in his favor.

Defendant denies that illicit relations ever existed between him and the testatrix, and, in case the court should find that such relations did exist, he denies that they were of the character described, or, in other words, that they constituted the "living together in open concubinage" from which results the incapacity pronounced by article 1481.

Inasmuch as the court finds that the illicit relations did exist, it becomes necessary to determine what must be the character of such relations in order that they should constitute a "living together in open concubinage" within the purview of article 1481.

That article reads as follows:

"Those who have lived together in open concubinage are respectively incapable of making to each other whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it cannot exceed one-tenth part of the whole value of their estate.
"Those who afterwards marry are excepted from this rule."

Defendant's learned counsel base an argument upon the words "have lived together." Words, they say, must be taken in their ordinary sense in the interpretation of a statute, and the ordinary sense of the words "have lived together" is "have dwelt or resided together"; and therefore the concubines must have lived together in the sense of dwelt or resided together, in order that article 1481 should apply to them.

We cannot adopt that construction. Residing together is a frequent concomitant of concubinage, but it is not an essential feature. There may be concubinage, and open concubinage at that, without it, just as there may be marriage without it. It is an invariable concomitant of marriage, but not an essential; its absence would not invalidate the marriage. We do not think it would do

to say that the law will take no cognizance of a concubinage so long as the concubines abstain from actually residing together. What the law aims at is the relation, the permanent relation of living together as man and wife, without being married, and, if that relation is maintained openly, the condition of article 1481 is fulfilled, even though the parties do not reside together. Under the interpretation contended for, a man might set up an establishment for a woman, visit her there regularly, raise a family with her, pay her bills, educate her children, by word or conduct, or both, avow his illicit relations with her, and yet the case not come within the purview of article 1481 so long as he resided elsewhere. We repeat, we do not think it would do to put that interpretation upon article 1481.

The adverb "together" does not modify the single verb "live." Its function in the sentence will become apparent if the sentence is first read without it, to wit, "those who have lived in open concubinage are," etc. That is to say, those who have lived in concubinage, whether with each other or with other persons, are, etc. Thus it is seen that, if "together" is removed from the sentence, the article is given a scope not intended by its framers—a scope whereby a father and son would be precluded from making donations to each other if both had had concubines. The function of "together," therefore, is to modify not the particle "lived," standing by itself, but the verbal phrase "lived in concubinage." In other words, the idea expressed is that the concubinage, and not necessarily the living, must be "together."

But we agree fully with counsel that the word "concubinage" as here used describes a status, and not mere acts of fornication or adultery, however frequent or even habitual. And we agree further with him that the "open" used in this article means "free from concealment, reserve, or disguise, not secret

or secretive, plain and aboveboard"; that the open concubinage here meant is one that is plain and aboveboard, without secret, reserve, or disguise, and not merely one that is notorious.

The word "concubinage" derives from the concubinatus of the Romans, a kind of marriage recognized by law, but of less dignity than the justæ nuptiæ, and not serving, like it, as the source of family and other legal relations. It ceased to describe legal marriage when the law came to recognize only one kind of marriage, but it continued to designate a status resembling marriage, and, at least in the civil law, does so to this day. "Pour qu'il y ait concubinage, il ne suffit pas d'un rapprochement passager et fortuit, c'est la fornication; le concubinage est, au contraire, permanent." Le Nouveau Denisart, vo. "Concubinage." The Grand Dictionnaire of Larousse, vo. "Concubinage," after giving the history of what is meant by concubinage, declares concubinage to be "the status of a man and woman who live together as man and wife without being married"; and it adds:

"We must not confound the concubine with the courtesan, or even with what is ordinarily called a mistress. The concubine is an entirely different thing. It is the wife without the title; it is marriage without the sanction of the law."

The Century Dictionary defines it as "the act or practice of cohabiting without legal marriage"; and it defines the word "cohabit" as "to dwell together; inhabit or reside in company; specifically, to dwell or live together as husband and wife." The Encyclopædia Britannica defines it as "living together as man and wife without legal marriage." The law dictionaries of Black and Bouvier define it as "a species of loose, informal marriage, which took place among the ancients, and which is yet in use in some countries. The act or practice of cohabiting in sexual intercourse without the authority of law or a legal marriage." These law dictionaries have taken their definition,

word for word, from Merlin, rep. vo. "Concubinage." Webster defines it as "the cohabiting of a man and woman who are not legally married." "Cohabit" has already been defined.

Such is and has always been the accepted meaning of the word "concubinage." Of course, the word may be wrenched from this meaning by the context and polarized into expressing something else; but so may any other word in the language.

The word "open," as found in article 1481, has a history, and it is this: Under the old French law the incapacity of concubines to make donations to each other was expressed by the maxim, "Don de concubin à concubine ne vaut." That law was affirmed by the Royal Ordinance of 1629, art. 132, according to which every donation between concubines was "null and of no effect." This left the door wide open for judicial inquiry into the relations of the donor and the donee in every case where their situation might afford color to a charge of concubinage. As a result, scandalous suits were carried on in which the lives of dead persons were investigated, their secret liaisons unveiled, and all kinds of scandalous rumors revived and exposed. The courts themselves found it necessary to put a check upon the operation of the law. Some of them restricted its application to cases where one of the concubines was married (Poitiers, 2 Juin, Hidreau c. Bonin); others to cases where there was written proof, or where the concubinage was notorious (Dalloz, Rep. vol. 16, p. 130, No. 266); and in all cases the facts from which the concubinage was to be deduced were required to be succinctly articulated in the pleadings, and not vaguely stated (Paris, 23 Ther., Ann. 2, Héritage, Chateaugiron). This was the condition of the law and the jurisprudence when the Code Napoleon came to be framed. The projet of it contained an article on this subject. It read: "Ceux qui ont vécu ensemble dans un concubinage notoire, sont re-

spectivement incapables de se donner." By this article the more conservative doctrine under the old law was sought to be adopted; that is to say, concubinage was to be visited with incapacity only when it was notorious. Knowing, however, to what extent under the old law the courts had teemed with scandalous cases, the commission, after extensive debates and discussions, rejected the proposed article, and left donations between concubines without any restriction whatever.

It was contended, says Laurent, vol. 11, No. 136, that "for the honor of families, and even in the interest of public order, it should not be permitted to scrutinize the private life of a man who was dead, the nature of his liaisons, and the character of his weaknesses. It was said that the scandal which would result from such discussions would be more injurious to society than the mere loss of fortune which might be inflicted upon the heirs."

In the same connection, Troplong, in his commentary on article 902, C. N., has the following:

"The Code has desired to obviate perquisitions which might be unjust, odious, or, at all events, scandalous; it has wished to dry up at its source a stream of poisonous accusations against him who has passed under the protection of the tomb, or against her whom cupidity would despoil of deserved liberalities. Besides, there are cases where the remedy is worse than the evil. It would have been perilous to disturb the ashes of the dead by digging into the secret intimacies of their lives, or to blazon their weaknesses in the open day. * * * Better seal up in the tomb these errings which publicity can only make worse, and it is an ill thing to make war upon the memory of the dead for sordid gain."

The framers of our Code had before them this old French law, and the Ordinance of 1829, and the jurisprudence which had grown thereunder, and the attempt to perpetuate the same in the Code Napoleon, and they had before them the debates and discussions which that attempt had provoked; and there can be no doubt that they deliberately adopted a middle course, restricting the incapacity to immovables, and substituting the word "open" to the word "notorious," so that mere notoriety should not suffice, but absence of concealment or disguise should be requisite. They fully appreciated the force of the objections which had been made, and the grave and unseemly scandals which resulted from permitting scrutiny into the private lives of people who were dead and no longer able to defend themselves, the rehashing of scandalous rumors, and the unveiling of their weaknesses and faults; but at the same time they were impressed with the necessity, in the interests of public morals, of making some distinction between people who lived together as man and wife under the solemn sanction of marriage, and those who maintained practically the same status, openly and publicly, without the sanction of marriage. They thought that such unambiguous, open, public, and shameless relations should be discouraged, and might be exposed without unnecessary invasion of the secrets of private life. They thought that the judicial ascertainment of such unambiguous and acknowledged relations might be made without introducing any elements of inquisition into private affairs, based on scandalous rumors or inferences, or even upon suspicious acts. For these reasons, they carefully and studiously confined the provision to "those who have lived together in open concubinage," meaning by the word "open" that the concubinage should be so public as to be practically avowed, not necessarily by word, but at any rate by unambiguous, unequivocal conduct; that the relations must be such that, when sought to be made the basis of judicial action, no odious inquisitions might be necessary, and no nice poising of testimony, as in this case.

Such inquisition into private life has not been necessary in any of the numerous cases in which article 1481 has heretofore been applied. In all of them, except one, the living together in open concubinage was conceded. These cases are Lowery v. Kline, 6 La. 380;

Succession of Bousquet, 10 Rob. 143; Olivier v. Blanc, 2 La. Ann. 517; Cole v. Lucas, 2 La. Ann. 946; Marty v. Mandeville, 3 La. Ann. 239; Bush v. Decuir, 11 La. Ann. 503; Mardis v. Mardis, 13 La. Ann. 236; Lazare v. Jacques, 15 La. Ann. 599; Veazie v. Stokes, 24 La. Ann. 229; Succession of Morvant, 46 La. Ann. 301, 14 South. 922; and Simpson v. Normand, 51 La. Ann. 1355, 26 South. 266. The one exception is the case of Succession of Hamilton, 35 La. Ann. 640. In it, the openness of the concubinage was contested; but the evidence showed beyond serious question that the testatrix and her legatee "lived together in open concubinage." There was no more secrecy about the life of the parties than there is about the life of any ordinary married couple. The testimony was that they lived together in the literal sense of the words. She kept an assignation house, and he, a bachelor, kept her; spent all his nights with her at her house, except when he would go to some entertainment, and nearly all his time during the day. She confined her favors to him. All this was established by several witnesses, and was not contradicted by the legatee, Jackson, who was present in court. The only countervailing testimony was that of one witness, who testified that Jackson had a room in his, the witness', father's house, and vaguely stated that Jackson made the house his home. The facts as thus detailed are not to be found in the opinion, but such they appear from the record.

Evidently the court considered the case a plain one, not calling for either a nice analysis of facts or a nice interpretation of law, but simply for an application of a plain law to plain facts; and we do not think that some expressions the court made use of in the opinion can be taken as having been intended to serve as a deliberate and authoritative interpretation of article 1481. Under any interpretation of the article the case came within its purview; therefore it might almost be said that the expressions in question, if really intended to be the announcement of an interpretation, were obiter dicta. Referring to the contention that the concubinage was not "open," the court said: "Jackson's living in concubinage was so open that several witnesses have testified to it. Their relations were notorious in their sphere." From this the inference would be that a concubinage to which several witnesses may testify, or that is notorious, is "open" within the meaning of article 1481. If the intention of the court was to express that idea, and if the dictum was not purely obiter, then all we can say is that it cannot be justified, and that we do not concur in it. It would restrict the meaning of the word "open" to the idea conveyed by the word "notorious," when, as already shown, the one word was substituted to the other ex industria in the drafting of article 1481.

Such, then, being the meaning of the words "lived in open concubinage," as found in this article of the Code, what are the facts of the case?

Decedent was the sister-in-law of the universal legatee and principal defendant, and an employé in his store. For several years she lived at his home. On closing the store at night he would escort her home. Afterwards she bought a house, and established a home of her own, and he continued to escort her at night. He did this with the sanction and at the request of his wife. On these occasions he would go into the house with her, and stay 20 or 30 minutes or an hour. On Sundays he would sometimes visit her at her house during the day. He was her counselor and friend, and managed all her business for her. This continued for a number of years. Without being married she gave birth to a child. She laid the paternity to a ship captain named Walter Bender. Defendant's wife does not seem to have suspected her husband, for she received her sister in her house for her confinement, and permit-

ted her eldest daughter and eldest son to stand sponsors at the baptism of the child. It was christened Walter Bender. It died within a few months, and was buried in the family tomb. Defendant's, accompanying his sister-in-law, and going into her house at night, and his visits on Sundays, led those of the neighbors who knew who they were to draw censorious inferences and to gossip, and led those who did not know who they were to suppose that they were man and wife.

These inferences and this gossip is testified to by several of the neighbors. The brother of the defendant testifies that he and his brother and the family knew that defendant was "as good as living with her." But upon what facts that knowledge was founded he does not say. He adds that his brother "suspected from all the talk" that the defendant was the father of the child; that "it was common talk." He also says that his brother wanted to "blow the defendant's head off," and that he, the witness, "knew it was disgrace enough." But the keen sense of disgrace of this witness, and the virtuous indignation of the brother, did not prevent the witness from visiting his sister as if nothing had happened. The decedent's sister testifies that she did not visit her erring sister except in the latter years, "because there was too much disgrace"; "they lived openly together"; "all the family knew defendant was the father of the child." Asked, "Why did they know that?" she answers, "Well, they were positive of it." Whatever condemnation this witness may have had for her sister, she seems to have had none for her brother-in-law, for her family relations with him suffered no change; he continued to visit at her house, and she at his, and she permitted her daughter to take a trip to Europe, at his expense, with him and his family.

Defendant denies positively that any improper relations existed between himself and his sister-in-law. The evidence shows that his family life continued undisturbed and unchanged. He took his meals at home, and slept at home. His two sons, his daughter, and his son-in-law testify they do not believe his relations with the decedent were other than they should have been. Defendant's, statement might be believed, and his conduct be entirely consistent with innocence, so far as any positive facts are testified to, if it were not for the testimony of one witness, who lived in the house of decedent. The court has a most unfavorable impression of this witness; she utters glibly and with apparent gusto things which the lawyers cannot repeat in the argument, and which this court would not dare here write down, and she "doth protest too much"; but in view of the strong corroborating circumstances, and of the fact that the learned judge a quo who saw and heard the witnesses put that interpretation upon the evidence, this court feels compelled to dispose of the case on that theory. This court has come to that conclusion reluctantly; for plaintiff's case is not benefited thereby, and to no purpose disrepute is brought to the defendant, and dishonor to the memory of the dead.

Whatever may be said of the relations of the defendant and the testatrix, they were not "open." His visits at night, which in all probability were the main cause of the gossip, were made ostensibly to escort her home. His wife saw nothing suspicious in them. His visits during the day, of a Sunday, were not in themselves suspicious, and may have been entirely innocent. While he was there one Sunday, his wife entered the house, and one of the censorious neighbors stood on watch, expecting an explosion; but—perhaps to her disappointment—none occurred; the wife simply came out again quietly, after a while, and went away. Doubtless, defendant would have shown more care of his sister-in-law's reputation by not escorting her beyond the threshold; but they were mature

people, who had lived under the same roof for five years, and who spent their days together in a store, and they may well have supposed that their brotherly relation placed them beyond suspicion. At any rate, they hid their concubinage, if such it, in fact, was, under the cloak of an innocent relation, and to such a case article 1481, as already shown, does not apply.

The judgment is therefore set aside, and the case dismissed at plaintiff's cost in both courts.

BREAUX, C. J., concurs in the decree.