JUANA ESTELA, ETC., Plaintiff and Appellant, *v.* HEIRS OF BENITO MEDRAÑO, Defendants and Appellees.

No. 6878.    Argued May 7, 1936.—Decided May 21, 1937.

*V. M. Fernández* for appellant.    *Arturo O'Neill* for appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

This is a filiation suit based on subdivisions 2 and 3 of section 125 of the Civil Code (1930 ed.).  In the view we take of the case, the sufficiency of the proof as to alleged concubinage during the pregnancy of the mother is the only

question that need be considered. The district judge, relying on a certain dictum or certain dicta in the dissenting opinion filed in *Colón* v. *Heirs of Tristani,* 44 P.R.R. 163, found that concubinage had not been established by the evidence because the putative father, although he spent most of his leisure time with his mistress, made his home or kept up the appearance of a separate abode in the house of a married son for reasons which are shadowed forth by the evidence.

This court has never said that concubinage cannot coexist with the maintenance of a separate place of abode or ostensible place of abode where the paramour keeps his clothes and a bed, takes most of his meals and, when confined to his bed, receives his friends. On the contrary, in *Méndez* v. *Martínez,* 24 P.R.R. 224, we did say this (italics supplied):

"Article 452 of the Penal Code formerly in force in Cuba and Puerto Rico punished the husband who had a concubine inside his house *or notoriously outside of his house. These citations indicate by themselves that it is not a necessary element of a state of concubinage that a man must take up a more or less exclusive residence with the woman,* as the appellant maintains. *We do not think that it is necessary for a state of concubinage to exist that a man should have no other residence than that of the woman.* As was pointed out by the Supreme Court of Louisiana, such a condition is not indispensable in a state of matrimony, nor was it for a state of concubinage. *Succession of Jahraus, infra.* The *Enciclopedia Jurídica Española* has a short article on concubinage, where it is expressed that the union that exists between a man and a woman to constitute concubinage should be enduring, continuous and persistent.

"Louisiana, which also indirectly inherits its law from Rome, also had a provision of law similar to Section 452 of the Penal Code for Spain and Cuba, where it is made a crime for a husband to keep a concubine in the matrimonial dwelling or openly and publicly in any other. The statute is set forth in the case of *Ledoux* v. *Her Husband,* 10 La. Ann. 663.

"Section 1481 of the Civil Code of Louisiana provides that those who have lived together in open concubinage are incapable of making a donation of immovables one to the other.

"In the case of *Succession of Jahraus*, 114 La. 456, a married man maintained a woman secretly and hence the court decided that Section 1481 did not apply, but in the course of the opinion the court said:

" 'Defendant denies that illicit relations ever existed between him and the testatrix, and, in case the court should find that such relations did exist, he denies that they were of the character described, or, in other words, that they constituted the "living together in open concubinage" from which results the incapacity pronounced by article 1481.

" ' *       *       *       *       *       *       *

" 'Defendant's learned counsel base an argument upon the words "have lived together." Words, they say, must be taken in their ordinary sense in the interpretation of a statute, and the ordinary sense of the words "have lived together" is "have dwelt or resided together"; and therefore the concubines must have lived together in the sense of dwelt or resided together, in order that article 1481 should apply to them.

" 'We cannot adopt that construction. *Residing together is a frequent concomitant of concubinage, but it is not an essential feature. There may be concubinage, and open concubinage at that, without it, just as there may be marriage without it.* It is an invariable concomitant of marriage, but not an essential; its absence would not invalidate the marriage. We do not think it would do to say that the law will take cognizance of a concubinage so long as the concubines abstain from actually residing together. What the law aims at is the relation, the permanent relation of living together as man and wife without being married, and, if that relation is maintained openly, the condition of article 1481 is fulfilled, *even though the parties do not reside together*. Under the interpretation contended for, a man might set up an establishment for a woman, visit her there regularly, raise a family with her, pay her bills, educate her children, by word or conduct, or both, avow his illicit relations with her, and yet the case not come within the purview of article 1481 so long as he resided elsewhere. We repeat, we do not think it would do to put that interpretation upon article 1481.'

"In the case of *Succession of Filhiol*, 119 La. 998, the court distinguished the case of Jahraus with respect to what constituted a secret relation between the parties and found a state of concubinage to exist between them where the facts, barring the question of being

notoriously known, were very similar to the facts of the case at bar. The reasoning of the court in the case of Jahraus that we have quoted was accepted.

"In the case of *Jahraus, supra,* on page 49, a French authority is quoted, defining concubinage to a similar effect as that defined in said case. From the antecedents in Puerto Rico, and the law we have been able to find in the jurisdictions having conditions similar to Puerto Rico, *we have no hesitation in concluding that when a man maintains a separate establishment for a woman* over a period of years and where he goes to visit her, staying with her three or four days at a time, *such a relation constitutes a state of concubinage.*"

From the opinion in *Medina* v. *Heirs of Bird,* 30 P.R.R. 151, 154, we take the following extract (italics supplied):

"The court below found that there was no proof of concubinage, and with this finding of the court we are in complete accord. There was some evidence, principally of the complainant herself, that she had carnal relations with Jesús Bird Arias at the time of the conception of Agustín Medina, but there was no satisfactory proof that this man and woman were living together in any marital sense or similarly to husband and wife. The concubinage to which the Civil Code has reference relates to a state of living together similarly to husband and wife without being actually married. It is not sufficient that a man installs a woman in a house and frequently visits her, *especially* if he has an independent home of his own, as the evidence tends to shows."

In the *Bird* case this court was dealing with a case in which the district court had found that there was no concubinage. This court was fully in accord with the finding of the district court. The incidental reference to the fact that the putative father in the *Bird* case had "an independent home of his own" was manifestly a mere make-weight as an additional circumstance in a case where the judgment appealed from would have been affirmed even though the putative father had not had "an independent home of his own." Such a reference can hardly be regarded as a repudiation of the *ratio decidendi* in *Méndez* v. *Martínez, supra.*

The pertinent portion of what was decided in *Gerena* v. *Suau*, 36 P.R.R. 151, is summarized in the syllabus as follows:

"Where the evidence does not tend to show that the relations between the putative father and the mother of the supposed natural son or daughter were similar to or approaching the marital state, but rather like those of a man who keeps a mistress, it is not proper to determine the compulsory acknowledgment of a child born of the woman contemporaneously with such relations, such acknowledgment being based on the fact of the parents living in a state of concubinage."

In that case, plaintiff was represented by her guardian because the mother, Dolores González "had interests opposed to the child." The court said (italics supplied):

" . . . The case of *Méndez* v. *Martínez, supra,* was much stronger in its facts. There the putative father practically lived a marital life with the mother of the alleged natural children. In the present case, accepting as true all the statements of the witnesses for the complainant, *the evidence does not show anything resembling a marital existence.* There was evidence tending to show that Bartolo Suau paid for the living quarters of Dolores González; that he was with her with great frequency, leaving her house late at night or early in the morning, meaning two or three o'clock in the morning. There was no evidence that he remained with her the whole of a night. There was no evidence that he took his meals with her. There was no evidence of that kind of a life where a man and a woman make a home together without having solemnly entered into the bonds of matrimony, *and there was nothing approaching such a state of affairs.* It was conceded and recognized by the court that Bartolo Suau, *while he did not have what might be called a home, nevertheless, slept in his own establishment and took his meals with his brother.*

"The idea of a state of concubinage is, as we have indicated in *Medina* v. *Heirs of Bird, et al.,* 30 P.R.R. 151, *a relation similar to or approaching the marital state. It might be quite a little less than a marital state and we should be disposed to recognize a state of concubinage, but a state of concubinage must differ from a relation where a man is merely maintaining a mistress.* It is true that Bartolo Suau spent long hours with Dolores González, *but we find*

*nothing in the evidence to elevate the relation that Bartolo Suau had with Dolores González to a state of concubinage.* Although one or two witnesses make such a conclusion, the record does not disclose anything like *a public knowledge of a state of concubinage between these two persons.*

"There is also a statement of Bartolo Suau, to which we shall refer hereafter, *wherein he positively denies having lived in a state of concubinage with anybody, and his denial is supported by the testimony of other persons.*"

The court later in its opinion also commented on the fact that Dolores González had not been put on the stand and said that the failure to produce her as a witness had not been explained.

As in the *Bird* case the court was considering the fact of separate residence merely as a circumstance bearing on the question of concubinage *vel non* just as it would have considered any other circumstance which might have had a bearing on that question. The case is not authority for the contention that the maintenance of a separate residence is incompatible with the existence of a state of concubinage. If it could be considered as authority for such a contention then, to that extent, it must be deemed to have been overruled in *Góñez* v. *Palmieri*, 50 P.R.R. 439.

In the instant case, the district judge found that Juana Estela was the mistress but not the concubine of Benito Medraño. We need not therefore rehearse the testimony in detail in order to establish the relationship of paramour and mistress. We think the evidence also establishes a state of concubinage even under the conservative view entertained by a bare majority of this court as constituted when the case of *Gerena* v. *Suau* was decided. If we are correct in this, we need not discuss nice distinctions between a well-kept woman and a concubine. Whatever the difference, if any, may be, the word "concubinage" as used by our legislature in subdivision 3 of section 125 of the Civil Code is not necessarily synonymous with the *"concubinatus"* of the Roman Law.

It is not necessary that a man and his mistress should hold themselves out to the world as man and wife in order to establish concubinage. It is not necessary that the relationship should be notorious. The only requirement of the law is that "the mother *was knówn* to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child." In the event of the father's death within a month or two of the birth of the child, it is enough if the mother was known to have been living in concubinage with the father during pregnancy and up to the date of his death. *Estela* v. *Heirs of Medraño,* 44 P.R.R. 143.

This is not the case of a man who rents a room for a woman, pays her expenses and visits her more or less frequently for the purpose of sexual rather than social intercourse. It cannot be said that "the evidence does not show anything resembling a marital existence." It cannot be said that "there was nothing approaching a state of affairs" such as "where a man and woman make a home together without having solemnly entered into the bonds of matrimony." Medraño was not "merely maintaining a mistress." It cannot be said that there is nothing in the evidence "to elevate the relation" between Medraño and his mistress "to a state of concubinage," if as conceded by the majority in *Gerena* v. *Suau,* a state of concubinage may be "quite a little less than marital state."

For a year or two prior to the death of Medraño's wife, February 11, 1929, Juana Estela, was a frequent visitor in the Medraño home where she made herself useful to Mrs. Medraño. She was not employed as a servant and received no wages but accepted occasional gifts from Medraño and his wife. It was during this period that Medraño's interest in Juana had ripened to a degree which explains the rapidity with which the situation developed after the death of Mrs. Medraño. Medraño was a home-loving man, apparently devoted to his wife and greatly depressed by the loss of her

companionship. A son, who was engaged to be married, hastened the wedding in order to take a house in San Juan and to make a new home for himself and his father in a new environment. In the meanwhile, Medraño told Juana that he needed a woman to take care of him and wanted her to be that woman. He then explained the situation to Juana's brother-in-law, in whose house Juana was living at the time, and the brother-in-law told him that he must find another place for Juana because he (the brother-in-law) had five children and did not want to set them a bad example. Medraño then made arrangements with another brother-in-law who lived within a stone's throw of Medraño's own home in Santurce and on February 18, Juana went to live in the house of this brother-in-law. Some three weeks later Medraño and Juana's brother-in-law, at the suggestion of Medraño, took an apartment in San Juan where they all lived together as one family during such time as Medraño could conveniently spend in the apartment. Medraño and the brother-in-law paid $35.00 a month for the apartment. Of this amount Medraño paid $15.00 and the brother-in-law $20.00.

About the same time the son was married and rented a house in San Juan where Medraño had a room and for a time at least took his meals, or most of them. He was on a diet which consisted of vegetable soups, cereals, milk punches and eggs. The son's mother-in-law prepared Medraño's food, called him for breakfast in the morning and occupied a room adjoining his own. She usually heard him when he came at night and testified that he usually returned about ten or eleven o'clock. On one occasion when taking his leave from Juana, he explained that he did not want to be missed at his son's house. There was testimony tending to show that, as time went on, he was spending more and more of his leisure time with Juana and less of it at the home of his son. This testimony also tends to show that for some time before his last illness he was spending practically all of

his time, night and day outside of working hours, with Juana and making her place of abode his home although he still kept his room and most of his clothes at his son's house. For reasons already stated, we do not deem it necessary to stress this point.

Medraño was the head janitor of a banking institution. His immediate subordinate, Juan Crespo, was his closest friend and confident. Soon after the commencement of Medraño's new *modus vivendi,* Crespo noticed a change for the better in Medraño's mental outlook and personal appearance and joked him about the latter. Before the end of March, Medraño told Crespo to knock on the door at room 45, Luna Street. Crespo did so and had a chat with Juana Estela and her sister. Later Medraño brought Juana to the bank in the evenings where she sat and waited for him until he finished his night work. On one of these occasions, Crespo rallied Medraño upon the prospect of a new heir and Medraño answered that soon he would have to start a new savings account. In June or July, Mrs. Crespo presented her husband with a son and Medraño and Juana Estela visited Crespo and his wife at their home. Medraño also used Crespo as a messenger at times when he sent fruit and other things to Juana Estela. When the bank sent Medraño to the hospital, he told Crespo to give Juana $6.00 a week while he was in the hospital and Crespo delivered the first instalment on the day of Medraño's death. This was about two months before the birth of the child.

Medraño, up to the time of his last illness, took a lively interest in the fact that he was again to become a father. When Juana became pregnant and developed a pain in the abdomen, he had her examined by his family physician. If the baby should prove to be a boy its name was to be Camilo. If it should prove to be a girl its name was to be Remedios. Medraño, before his last illness, had already provided Juana with some of the things that would be needed

at the time of her confinement. He was not niggardly in his treatment of her. He did not flaunt his new relationship in the faces of his deceased wife's family and friends nor in the faces of his son and of his son's wife and mother-in-law, but the evidence as a whole leaves no doubt in our mind that he and Juana Estela were living in a state of concubinage.

The judgment apealed from must be reversed and, in lieu thereof, the judgment of this court will be entered adjudging Esteban Camilo Estela to be the natural son of Benito Medraño with the right to bear his father's name and all other rights which the law may confer upon him by reason of his status as such natural son, without special pronouncement as to costs.

Mr. Justice Wolf dissented.