PER CURIAM.
Although never married to each other, Fannie F. Green and George L. Mears, Sr. lived together ostensibly as husband and wife from 1970 until she died in 1983. The collateral heirs of Mrs. Green have taken this appeal from an adverse judgment in their action under LSA-C.C. art. 1481 to *638 annul and reduce donations mortis causa made by the testator to defendant Mears. The trial judge found that the relationship of the two parties met the jurisprudential definition of “concubinage,” but not that of “open concubinage,” and rejected their demands. We affirm.
The governing article of the Louisiana Civil Code, LSA-C.C. art. 1481, provides in pertinent part as follows:
“Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it can not exceed one-tenth part of the whole value of their estate.”
Historically, our courts have insisted that for Article 1481 to be applicable, the party attacking the donation must establish both that the relationship between donor and donee was “concubinage” and also that it was “open.” Concubinage is the status or relationship in which a man and woman live together like husband and wife without being legally married. Open concubinage exists when the illicit relationship is not disguised, concealed, or made secret by the parties. Efforts by the parties to hide the illicit relationship are strong indications that it is not open. Succession of Jahraus, 114 La. 456, 38 So. 14 (1905); Thomas v. Thomas, 440 So.2d 879 (La.App. 2d Cir.1983), writ denied, 443 So.2d 597 (La.1988).
The facts of this case are very similar to those in Succession of Lannes, 187 La. 17, 174 So. 94 (1937), wherein our Supreme Court refused to apply Article 1481 where the unmarried parties had concealed their illicit relationship from the public by holding themselves out as being husband and wife. Although the Lannes case was settled while a rehearing was pending, it has since been cited as authority in numerous decisions of our courts of appeal and also by the Supreme Court. Miller v. LaFrance, 359 So.2d 328 (La.App. 4th Cir.1978), writ denied, 362 So.2d 580 (La.1978); Succession of Washington, 140 So.2d 906 (La.App. 4th Cir.1962); Succession of Moore, 232 La. 556, 94 So.2d 666 (1957); Succession of Cervini, 228 La. 1054, 85 So.2d 818 (La.1956); Manning v. Harrell, 59 So.2d 389 (La.App. 2d Cir.1952).
It is well settled that whether or not the illicit relationship between the parties was concubinage, and if so, whether it was open are factual matters, and the trial judge’s determination thereof should not be reversed on appellate review unless they are manifestly in error or clearly wrong. Succession of Moore, supra; Gray v. Gray, 451 So.2d 579 (La.App. 2d Cir.1984), writ denied, 457 So.2d 13 (La.1984); Succession of Lamy, 454 So.2d 290 (La.App. 2d Cir.1984), writ denied, 458 So.2d 477 (La.1984).
As stated, the district court found from the evidence that the parties’ concubinage was not open because, with but few exceptions, they had concealed the fact that they were not married by holding themselves out to the public as being husband and wife. From our review of the record we cannot say the trial judge was manifestly in error or clearly wrong. Accordingly, the judgment of the district court is affirmed at appellants’ cost.
Attached as an appendix is a copy of the trial judge’s written reasons for judgment.
AFFIRMED.
APPENDIX
HOOD, Judge.
Fannie Frances Green died May 23, 1983, leaving a will dated September 16, 1974. In her will, she bequeathed all of her property to George L. Mears, Sr. The decedent’s surviving brothers, sisters, nephews and niece have filed this suit seeking the annulment of the will insofar as it attempts to transfer immovable property to Mears, and to reduce the donation of movable properties so as not to exceed one-tenth (l/10th) of the value of the entire estate. The basis of the suit is the allegation that for many years prior to her death, the decedent lived in open concubinage with the defendant Mears.
*639 Civil Code Article 1481 states that those who have lived together in open concubinage are respectively incapable of making to each other any donation of immovables, and if they make a donation of movables, it cannot exceed one-tenth part of the whole value of their estate.
The resolution of this dispute therefore lies in the definition of the term “open concubinage”, and the application of that definition to the facts of the case.
The courts have historically insisted that a definite meaning be ascribed to both the words “open” and “concubinage”, before finding that the legal requisites of open concubinage have been proven.
Concubinage depicts a state of affairs in which a man and woman exercise with respect to each other the rights and privileges of marriage, a relationship in which they live together as husband and wife without being legally married. It is crucial to the definition of open concubinage to note that it depicts a status or relationship, rather than an act or series of acts.
The courts have also ascribed a definite and distinct meaning to the term “open”. Thus, it is not enough that concubinage be proven. The courts have additionally required that concubinage be “open.” Concubinage is said to be open when the illicit relationship is not disguised, concealed or made secret by the parties. Concubinage is open when the parties involved avow their illicit relationship by words or conduct. A finding of “openness” clearly does not require that the parties verbally acknowledge their illicit relationship. However, efforts taken by the parties to conceal their illicit relationship militates against a finding of openness.
“In Succession of Jahrus, 114 La. 456, 38 So. 417, this court had occasion to inquire into the meaning of ‘open concubinage.’ The court said that the word ‘concubinage’ describes a status and not mere acts of fornication or adultery however frequent or even habitual; that the word ‘open’ means free from concealment, reserve or disguise, not secret, but plain and above-board; that ‘open concubinage’ means one that is plain and above board, without secret, reserve or disguise, not merely one that is notorious; that ‘the concubinage should be so public as to be practically avowed, not necessarily by word, but 'at any rate by unambi-gious, unequivocal conduct; that the relations must be such that, when sought to be made the basis of judicial action, no odious inquisitions might be necessary, and no nice poising of testimony.’ ” Jones v. Kyle, 168 La. 728, 123 So. 306.
Fannie Green was seventy-five years of age on the date of her death, she having been born January 17, 1908. Her second husband, Clarence Green, died in February, 1969. Thereafter, she and Mears met each other, and in 1970, he moved into her home. He lived with her continuously until her death in 1983. When they began living together, she was sixty-two years of age, and he was approximately sixty-five years of age. Both were of modest means. Both lived on pensions. Fannie Green’s pension came from a railroad company for whom her deceased husband had worked. They never married because Fannie Green would have lost her pension had she done so, and it would have been most difficult, if not impossible, for the both of them to have lived on Mears’ pension. They maintained a joint bank account in the name of Mr. and Mrs. George L. Mears, Sr., each putting his or her income into the account. All of their expenses were paid from the joint account.
Their relationship met the definition of “concubinage”. However, their relationship did not meet the definition of “open” concubinage. They held themselves out to the public as Mr. and Mrs. Mears. They introduced themselves in that manner, and were introduced by others, including petitioners, to others in that same manner. Mears testified that he never discussed their relationship, that is, whether they were married, with anyone, with two exceptions. One was their banker. The Internal Revenue Service had contacted the bank inquiring as to whom some interest should be charged, to him or to her. The banker sent them a letter, and they went to the bank and told the banker the truth, that *640 they were not married. They gave the bank their social security numbers, and heard nothing from the bank or the I.R.S. thereafter.
The second exception was the attorney who drew up their wills, one being the will in question.
Mears also testified that he believed their doctor knew they were not married, but he had never had any discussion with the doctor about it. However, when she went to the hospital, she was registered in the name of Fannie Green, because that was the name in which her hospitalization insurance through the railroad company was carried.
Mears had told his son and daughter, who lived in California, that he and Fannie were married.
At the trial, the only witnesses who testified other than Mears were petitioner Mrs. Earline Jones, Fannie’s sister, and her husband, Stanley W. Jones; petitioner Robert Busby, Fannie’s brother; and Lela Busby, wife of Roy Busby, another brother. Obviously, all of the petitioners, members of Fannie’s family, knew there was no marriage.
Mrs. Earline Jones testified that up until approximately three years ago, she and her husband lived in Kenner, Louisiana. Mears and Fannie had visited with them on several occasions in Kenner. She told of one occasion when they went to a lounge in Kenner where she and her husband introduced Mears and Fannie to the owners of the lounge as husband and wife. She later told these friends that Mears and Fannie were not in fact married. She never heard Mears tell anybody they were not married.
Her husband confirmed that he and his wife had told the owners of the lounge outside the presence of Mears and Fannie that they were not married. He also said that once, he, outside the presence of Mears, in a bar, talked with several railroad men who knew that Mears and Fannie were not married.
Robert Busby testified to the effect that “just about everybody I knew of knew they weren’t married.” No identities were given. However, he further testified that he never talked to neighbors or business places, or grocery store people about it, and that he does not remember anybody discussing them not being married, except Fannie’s niece, Margie Roach, a petitioner.
Lela Busby testified that she did not discuss with anyone whether Mears and Fannie were married. She said that if she was not aware of the facts, she would have thought they were married.
Mears testified that there was another person, Viola Robertson, to his knowledge, who knew they were not married. Viola Robertson was a close friend of Fannie’s, and Fannie had told her near the end of her life. Fannie had started going to church the last three years of her life, and Fannie gave him this explanation as to why she had confided in her friend.
These, then, are the people that the evidence reveals knew Mears and Fannie were not married — the petitioners, members of Fannie’s family; Mears and Fannie’s banker, the lawyer who drew up their reciprocal wills and, possibly, their doctor, between each of whom there existed a confidential relationship; several employees of the railroad company for whom Fannie’s deceased husband had worked; the owners of a lounge in Kenner and possibly a few others who learned of the true facts through petitioners; and finally, Viola Robertson, a close friend and confidante of Fannie’s.
This evidence falls far short of preponderating in favor of the conclusion that Mears and Fannie lived together in “open concubinage” as defined by the law.
The concealment of their concubinage was almost as perfect as humanly possible. The ones who knew the truth, according to the evidence, cannot be characterized as “the public”. Their concubinage relationship cannot be said to have been free from concealment, plain and above-board, without secret, and so public as to be practically avowed.
*641 Accordingly, judgment will be rendered in favor of the defendant, rejecting the demands of the plaintiffs at plaintiffs’ cost.
A formal decree will be signed when presented.
Lake Charles, Louisiana
July 17,1985