(38 South. 575.)

No. 15,416.

Succession of LANDRY.*

(April 24, 1905.)

DONATION CAUSA MORTIS—CONCUBINAGE—
EVIDENCE.

1. A donation mortis causa in favor of one with whom the testator has lived in open concubinage must, at the instance of the heirs at law, be reduced to one-tenth part of the value of the estate, payable from the movables.

2. Where parties are living in concubinage, their acknowledgment of the fact, when voluntary and unnecessary, is sufficient to establish its openness.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

In the matter of the succession of George Landry. Suit by legal heirs against Angeline Yohe to set aside a will. From the judgment, Yohe appeals. Affirmed.

Charles Joseph Théard, Charles Ferdinand Claiborne, William V. Seeber, J. Zach. Spearing, and Albert Vorhies, for appellant. John G. Robin and James J. McLoughlin, for appellees.

### Statement.

MONROE, J. The heirs of the blood of George Landry sue to annul his will on the ground that he and the universal legatee named therein lived together in open concubinage. This is denied by the universal legatee, who appeals from a judgment reducing the legacy in her favor to one-tenth of the estate, payable out of the movables.

The testator was a negro, formerly a slave, married, but childless, whose business career since his emancipation was so far successful that he had become the owner of several pieces of real estate, and was regarded among people of his class as a man of means. The legatee is a white woman

who came to this country from France in 1884, and, up to the time of the establishment of the relations between her and the testator which are now to be considered, had maintained herself mainly by menial labor. In 1892 she went into business in a small way as a dressmaker or sewing woman, in which capacity in 1893 she was employed by the testator's wife, and in that way made his acquaintance; she being then about 29 years of age, and he probably between 65 and 70, though of strong physique. In September, 1894, the legatee rented from the testator one side of a double tenement cottage, and the testator subsequently found frequent occasion to go there—the legatee says, to superintend repairs, etc.; other witnesses say, for other reasons. Whatever rent was paid was collected by the testator himself, though the rental from other tenements belonging to him was collected by a man whom he had for several years employed for that purpose. The legatee produces receipts for the rent up to January, 1897, and testifies that those covering a subsequent period of some eight or ten months, up to the time they began living together as will be hereinafter shown, have been mislaid.

On Christmas Day, 1896, the testator sent his nephew Casimir Daniel, Jr. (otherwise called "Tipape"), to the legatee, with a turkey to be cooked, and, that service having been rendered, Daniel called for and obtained the turkey about 4 o'clock in the afternoon, and took it to the residence of the testator, where it was served for their dinner; the wife of the testator refusing to partake of it for the reason that it had been cooked by the legatee. At what hour the dinner was finished does not appear, but it does appear that after it was finished the testator and his nephew left the house, and that some time later (probably between 7 and 9 o'clock) the wife of the testator, who had within the few years preceding become addicted to drink, was burned to death, as a

---

*Rehearing denied May 22, 1905.

result, it is said, of an accident with an oil lamp, though no one seems to have been present at the time, and no particulars are given. The fact of the burning having become known to Daniel very shortly after it occurred, he went at once to the cottage of the legatee to convey the information to the testator. The legatee admits that he came there for that purpose, but says that the testator was not there. She does not undertake to explain why he should have been sought at her house, and Daniel tells another story as to the result of his visit. For some months after the death of his wife the testator's sister Mrs. Oscar, with one or more of his nieces, stopped at his house, and he made the offer to his sister that she should remain in charge; but she declined to do so on the ground that she had a home and duties of her own, and suggested that he secure the services of some more needy relative—a suggestion which he declined to adopt. The testator then made an arrangement with the legatee, as the result of which in September, 1897, he moved into the other tenement of the double cottage, the one tenement of which was already occupied by her; and, the two tenements having been practically thrown into one, the legatee thereafter, with the assistance of a little girl hired for that purpose, and of other persons occasionally employed, cooked and washed for, nursed and took care of, the testator until he died, a period of about six years. She testifies that he agreed to pay her $20 a month and to make his will in her favor, and further she says:

"He told me he would pay me, but in two years I asked him, and he told me, 'If you want the money, I know I owe it to you, and I have to give it to you, but I must sell one property, or either mortgage it, and I have so many mortgages I don't like to do it.' That is the time he showed me his will. Q. How did you live during those two years without any wages? A. Well, I was sewing for out—dressmaker; keep on my dressmaker all the time. Q. As well as keeping house? A. Yes, sir. Q. Did Mr. Landry ever pay you any wages? A. No, sir. Q. Never at any time? A. No, sir. Q. Didn't you think it strange that he didn't pay you any wages at the end of the first month? A. No, sir; because he told me that he would give me everything, but he never showed me his will until two years after. * * * Q. Were you not more a friend than a servant? A. No, sir. Q. Didn't you always eat at the same table with him? A. Yes, sir; we was eating at the same table."

The will was made in February, 1898, and the parties had lived in the manner described for about four years and a half when the testator found it advisable to resume control of a grocery and bar in which he was interested; and he and the legatee accordingly moved to the place, and there established themselves upon the existing basis, save that she took upon herself the additional work of retailing groceries and liquor, and that there was a door between her bedroom and that of the testator. Being interrogated as to her life at the grocery, the legatee testifies as follows:

"Q. In the grocery you lived as one family? A. Not quite; no, sir. Q. But you had the same household articles, and made one marketing? A. Yes, sir. Q. And made one meal? A. Yes, sir. Q. The same table for both of you? A. Yes, sir; working people and everything; everybody eating at the same table. Q. It was a common purse—the expenses were common to both of you? A. Yes, sir. Q. You kept no separate account? A. No, sir. Q. He paid for your clothes? A. I never bought clothes for myself since I am in the grocery."

A few months before his death, which occurred in October, 1903, the testator registered the legatee as a passive member of a benefit society to which he belonged, and after his death she received from the society the "benefit," as contemplated by its rules.

The facts thus far stated are wholly uncontradicted, the attitude of the legatee in regard to them being that they prove nothing to the point. We now proceed to the consideration of other alleged facts, the existence of which is denied, though in some instances the denial is made only in the argument of counsel, and was not made by the legatee as a witness.

Thus Frank François, a witness called on

behalf of the plaintiffs in rebuttal, testifies that during the life of the testator's wife, and whilst the legatee was living in the cottage, the testator was in the habit of leaving his house on Saturday evening under the pretense of going across the lake; that he (witness) was employed to carry testator's valise; that it was their habit, after leaving the testator's house, to linger about (usually near the corner of Claiborne street and Elysian Fields) until it was thought that he could do so without being observed by the neighbors (say until half past 10 o'clock), when the testator would go to the house of the legatee, and there remain until the next (Sunday) night, when the witness would go to the legatee's house, get the valise, and return with the testator to the latter's home.

Pali Hubert, an old negro woman, who had been summoned on behalf of the legatee, was called to the stand as a witness for the plaintiffs, and testified that she visited the testator whilst he and the legatee were living in the cottage; that she asked the testator what he was doing with a white woman in his house, and that he answered, in the presence of the legatee:

" 'That is my mistress. * * * You know how I mean. That is my wife.' Q. Did you tell anybody of that conversation you had with Mr. Landry? A. I never told it, because, when I came out, he told me, 'I don't visit anybody, and nobody don't visit my house, on account of I got a white wife, but you mustn't tell on me.' I said, 'I am not going to tell,' and this is the first time I told it, too. I never told anybody that."

Alex Harris testifies that he was chairman of the relief committee of the society of which the testator was a member; that the testator asked whether he could register the legatee as a beneficiary, "because he was living with her, and he didn't want anybody to know it"; that the legatee was present at the conversation; and that he (the witness) then and afterwards, when he paid her relief money, during the life of the testator, call-

114 LA.—27

ed her "Mrs. Landry," without objection on her part.

Daniel Jones testifies that he called on the testator at the grocery, and that the latter introduced him to a lady as his wife. Being asked, "Was it this lady?" (referring to the legatee, who was present), he answered, "It favored her very much. I think it was that lady."

The judge a quo, in his able and exhaustive opinion, states that these witnesses appeared to be speaking truthfully, and that the legatee, "sitting then at the bar of the court, did not attempt to contradict them." Referring to the testimony of François, he says:·

"While under cross-examination, François became excited when questioned about owing money to Landry. The question was apparently on the suggestion of Angeline [the legatee], who was at the bar of the court in consultation with her counsel; and the witness told of an attempt on the part of Landry and Angeline to bribe him to throw a coal-oil lamp on Clara [the testator's wife] while she lay in a drunken stupor, and burn her up. This was a diabolical conspiracy to murder an old woman who was in the way of her husband and a young woman, and it is not readily believed. But this case contains other incredible things, until they had been proved, according to the law of evidence, by a preponderance of evidence, and this one may also be believed. It is uncontradicted. Counsel, in argument, assumed that the story was so absurd as not to merit consideration. The statement is as easy of belief as that Angeline and Landry lived in concubinage, and this belief has been forced upon the court by a preponderance of testimony."

The testimony of François to the effect that the testator spent days and nights at the house of the legatee before the death of his wife, and whilst pretending to be across the lake, is corroborated by that of a witness named Coulon, who also carried his valise, and who further testifies that upon other occasions the testator would visit the house of the legatee, and remain there half the night, and by that of Casimir Daniel, Jr., who testifies that his uncle was so much in the habit of visiting the house of the legatee, and he (the witness) was so much

in his confidence, that when he went there after him he (the witness) would enter the house without knocking, if he found the door open; that he sought his uncle there upon the night when his wife was burned because his uncle had told him that he was going there; that he found him there, in bed; was ushered into his room by the legatee herself; and that he helped his uncle to dress, after which the latter went to his home by a circuitous route in order to escape observation.

The testimony of the old woman, Hubert, and of Harris and Jones, relates to the period after the death of the testator's wife; and a slater, named Kennedy, speaking of the same period, testifies that, having finished some work on the cottage early one morning, and having inquired of the legatee for the testator, the latter called to him to come in, and that, going into the house, he found the testator in bed in the legatee's room; that the witness asked him, "Is this the madam? Are you married?" to which the testator replied, "Well, Paul, you know how men are. Hold your peace." There is other testimony, which need not be noticed.

## Opinion.

We entertain no doubt that illicit relations existed between the testator and legatee prior to the death of the testator's wife, and continued up to the time of his death. It is true that during the life of his wife the testator observed some secrecy in the matter, and that he and the legatee did not at that time live together; and it is also true that after his wife died, and whilst he and the legatee were living together, he at times exhibited some little hesitation, which may not have been altogether unconnected with apprehensions of personal danger, not in acknowledging, but in having published, the true state of affairs. Nevertheless such acknowledgments were made by him in the presence of the legatee, without denial or protest on her part, and upon at least one occasion without suggestion that the matter be kept secret; and those acknowledgments, voluntary and unnecessary, taken in connection with the fact that the parties were living together in concubinage, are sufficient to establish the openness of the concubinage, though there were no other evidence tending in same direction.

Under these circumstances, the testator was incapable of making to the legatee any donation of immovables, and no donation so made of movables could lawfully exceed one-tenth part of the value of his estate. Civ. Code, art. 1481.

The judgment appealed from is accordingly affirmed.