174 So. 94 .

**Succession of LANNES.**

No. 34039.

Dec. 21, 1936.

Rehearing Granted Feb. 1, 1937.*

---

* Under the constitution, at least four justices must concur in order to deny a rehearing. Justice Brunot, who signed the majority opinion, having retired, and the Court being equally divided, a rehearing ipso facto resulted. While the case was thus pending, it was compromised.

McCloskey & Benedict and W. Sommer Benedict, all of New Orleans, for appellant Emma Stevens, sometimes known as Mrs. E. J. Lannes.

McLoughlin & West, of New Orleans, for appellants Mrs. Marie Day Matthews and William Day.

Curtis, Hall & Foster, of New Orleans, for appellee William S. Lannes.

HIGGINS, Justice.

This is an action by a residuary legatee and an intervention by collateral heirs filed for the purpose of having reduced a testamentary disposition in favor of Emma Stevens, on the grounds that she had lived in open concubinage with the testator and, therefore, under the provisions of article 1481 of the Revised Civil Code, was not entitled to receive more than "one-tenth part of the whole value" of his estate, from the movable property. The plaintiff, as residuary legatee, also claimed that the legacy in his and Emma Stevens' favor was a conjoint one, and that under the law of accretion found in article 1706 et seq., he was entitled to 40 per cent. of the legacy which the testator was legally incapable of bequeathing to her.

The interveners, as collateral heirs of the deceased, i. e., nephews and nieces, children of a predeceased sister of the testator, also claimed the alleged ineffective portion of the bequest to Emma Stevens, denying that the law of accretion was applicable in plaintiff's favor.

The defense of Emma Stevens was that the concubinage was not "open" or public, but closed or secret.

The trial judge held that the plaintiff had successfully proved that the concubinage was "open" and, also, that under the law of accretion, the plaintiff, as conjoint residuary legatee, was entitled to the portion of the estate the testator had illegally attempted to give to Emma Stevens.

The defendant, Emma Stevens, and the interveners appealed.

All of the evidence in this case was introduced by the plaintiff without any objection by the defendant and it shows that during the year 1900 Emile J. Lannes and Emma Stevens, without being married, began to live together as man and wife; that, at that time, she had a son of a previous marriage, who was eight years of age; that Emile J. Lannes was single; that both parties were of the Caucasian race; that she was introduced and known as Mrs. Emile J. Lannes; that they lived in eleven separate and distinct residences in this city, in respectable white neighborhoods, and were always known and regarded as husband and wife, or Mr. and Mrs. Emile J. Lannes; that the charge accounts, the rent, the gas, light, and water bills were paid by Mrs. Emile J. Lannes, and in each and every instance she was considered and respected by the merchants with whom she dealt as the wife of the deceased; that there

were no rumors, intimations, or suggestions of wrongdoing or illicit relations between them during his lifetime; that the deceased's younger brother, William S. Lannes, Sr., plaintiff herein, was employed by the testator in his cigar business in a confidential capacity and he and his immediate family were the only ones who knew that the couple was not married; that they never divulged this information until after his death; that Emma Stevens was as faithful, loyal, and attentive to the deceased as if she were his wife; and that her son, Leslie Ludlow, who, with his wife, resided with the couple, and who at the date of the death of the deceased, September 22, 1935, was forty-three years of age, was surprised and astounded when he was apprised by William S. Lannes, Sr., and William S. Lannes, Jr., that his mother was not married to the testator, this information being brought to light in connection with the death and funeral notices of Emile J. Lannes.

It is undisputed that the estate consists of movable property.

The pertinent part of the olographic will dated August 21, 1933, reads as follows:

"I hereby nominate Leslie Ludlow [son of Emma Stevens] and William Lannes, Jr., to be executors of this my will and they shall be exempt from giving bond. They shall receive Seventy-five dollars each for their services. All the rest of my estate to be divided equally between William S. Lannes, Sr., my brother, and Emma Stevens, my life long friend." (Brackets ours.)

Article 1481 of the Revised Civil Code reads:

"Those who have lived together in *open concubinage* are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and if they make a donation of movables, it *can not exceed one-tenth part of the whole value of their estate.*

*"Those who afterwards marry are excepted from this rule."* (Italics ours.)

Counsel for defendant concede that the plaintiff has successfully shown that the deceased and Emma Stevens lived in concubinage. But they strenuously urge that the proof is not only inadequate or insufficient to show that the relation was open or public, but, on the contrary, that it clearly appears that the concubinage was disguised and concealed.

The controversy on the first issue hinges upon the proper interpretation of the words "open concubinage," found in the article of the Code. The subject is one with considerable historical background which must be considered in arriving at the proper construction of the article of the Code and the application of the authorities pertinent thereto.

In Biblical times, no odium or reproach was attached to the concubine, as clearly shown by the following extract from the Jewish Encyclopedia, Vol. 10, page 35:

"Pilegesh (Biblical data): A concubine recognized among the ancient Hebrews. She enjoyed the same rights in the house as the legitimate wife. Since it was regarded as the highest blessing to have

many children, while the greatest curse was childlessness, legitimate wives themselves gave their maids to their husbands to atone, at least in part, for their own barrenness, as in the cases of Sarah and Hagar, Leah and Xilpah, Rachel and Bilhah. The concubine commanded the same respect and inviolability as the wife; and it was regarded as the deepest dishonor for the man to whom she belonged if hands were laid upon her. Thus Jacob never forgave his eldest son for violating Bilhah. (Gen. xxxv: 22, xlix, 4). According to the story of Gibeah, related in Judges XIX, 25,000 warriors of the tribe of Benjamin lost their lives on account of the maltreatment and death of a concubine. Abner, Saul's first general, deserted Ishbosheth, Saul's son, who had reproached his leader with having had intercourse with Rizpah, the daughter of his royal father's concubine, Aiah (II Sam. iii: 7); Absalom brought the greatest dishonor upon David by open intercourse with his father's concubines (Ib. xvi: 21 et seq). The children of the concubine had equal rights with those of the legitimate wife. * * *

"According to the Babylonian Talmud, the difference between a concubine and a legitimate wife was that the latter received a Ketubah, and her marriage was preceded by a form of bethrothal."

In the case of Badillo et al. v. Francisco Tio, 6 La.Ann. 129, at page 132, the court concisely stated the progressive steps which brought about the legal recognition of concubinage, as follows:

"It is a matter of history, that under the Roman Empire marriage fell gradually into disuse. Whether this was owing, on the part of the men, to looseness of morals, or, as some historians intimate, to their unwillingness to submit to the domestic tyranny which the matrons of the Sabinian race were wont to exercise over their husbands, the fact is undeniable; and neither the fines imposed upon bachelors, nor the giving the seat of honor to married men in all public places, and exempting them to a great extent from the exactions of the fisc, had any effect in arresting the progress of the evil. It is stated, that the emperor on one occasion called all the bachelors in the city to his presence, ordered them to mend their ways, and threatened them with the consequences of his displeasure if they did not. But although their fear of the emperor was great, their fear of matrimony prevailed, and despotic power had finally to yield to their obstinacy. As marriage fell into disuse, what was called in Rome unequal marriages superseded it and rose in importance, and it may be said in dignity. Unequal marriages were conventions by which a woman of inferior condition gave herself or was given by her relatives in presence of witnesses to a single man, to live with him in a state of concubinage. This was a serious contract, intended to be permanent, and the forms of which were established by law. The woman who entered into it did not lose caste; she retained the good opinion of her friends and relatives, and her children had capacity to inherit her estate and a portion of that of their father, either by will or ab intestato. This is no doubt the origin of the morganic marriage as it now exists in some portions of Ger-

many. The laws providing that a man could have but one concubine, and giving to his natural children the right to inherit from their father, were enacted by Justinian. L. 3 Dig. de concubin. L. 16, § 1. Dig. de ritu nuptiarum, L. 3. Codic. de natural. Liberis, Novel. ch. 18, §5, si autem."

In the case of Cole v. Lucas (1847) 2 La.Ann. 946, at page 952, the court said:

"By the 1468th article of our Code, those who have lived together in open concubinage. are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables; and, if they make a donation of movables, it cannot exceed one-tenth part of the value of the whole estate. Those who afterwards marry are excepted from this rule. No issue is made as to the proportion the amount of the gift to Patsy bears to the estate, and the only question raised is as to its validity. We have already stated our opinions of the relations subsisting between the parties to this donation. *The disabilities under which the law places persons who have lived in this condition, are created for the maintenance of good morals, of public order, and for the preservation of the best interests of society."*

In the Succession of Jahraus, 114 La. 456, 38 So. 417, the sister-in-law of. the universal legatee was employed in his store. For several years she lived in his home, where he maintained his wife and children and where they had illicit relations. She then bought a house and established her own home, where, with the consent of his wife, he escorted her nightly, remaining from twenty minutes to one hour. On Sundays he visited her house during the day. She gave birth to a child, without being married. Her sister, the wife of the universal legatee, continued to receive her in their home and permitted the baptism of the child to be conducted there, with her eldest daughter and son standing as sponsors. There were considerable rumors and gossip in the community as to their illicit relations and that he was the father of the illegitimate child. In holding that the concubinage was abundantly proved, and that it was not·shown to be open but secret concubinage and, therefore, article 1481 of the R.C.C. was inapplicable, the court, 114 La. 456, on pages 460, 461, and 462, 38 So. 417, 418, said:

"The word 'open,' as found in article 1481, has a history, and it is this: Under the old French law the incapacity of concubines to make donations to each other was expressed by the maxim, 'Don de concubin á concubine ne vaut.' That law was affirmed by the Royal Ordinance of 1629, art. 132, according to which every donation between concubines was 'null and of no effect.' This left the door wide open for judicial inquiry into the relations of the donor and the donee in every case where their situation might afford color to a charge of concubinage. As a result, scandalous suits were carried on in which the lives of dead persons were investigated, their secret liaisons unveiled, and all kinds of scandalous rumors revived and exposed. The courts themselves found it necessary to put a check upon the operation of the law. Some of them restricted its applica-

tion to cases where one of the concubines was married (Poitiers, 2 Juin, Hidreau c. Bonin); others to cases where there was written proof, or where the concubinage was notorious (Dalloz, Rep. vol. 16, p. 130, No. 266); and in all cases the facts from which the concubinage was to be deduced were required to be succinctly articulated in the pleadings, and not vaguely stated (Paris, 23 Ther., Ann. 2, Heritagé, Chateaugiron). This was the condition of the law and the jurisprudence when the Code Napoleon came to be framed. The projet of it contained an article on this subject. It read: 'Ceux qui ont vécu ensemble dans un concubinage notoire, sont respectivement incapables de se donner.' By this article the more conservative doctrine under the old law was sought to be adopted; that is to say, concubinage was to be visited with incapacity only when it was notorious. Knowing, however, to what extent under the old law the courts had teemed with scandalous cases, the commission, after extensive debates and discussions, rejected the proposed article, and left donations between concubines without any restriction whatever.

"It was contended, says Laurent, vol. 11, No. 136, that 'for the honor of families, and even in the interest of public order, it should not be permitted to scrutinize the private life of a man who was dead, the nature of his liaisons, and the character of his weaknesses. It was said that the scandal which would result from such discussions would be more injurious to society than the mere loss of fortune which might be inflicted upon the heirs.'

"In the same connection, Troplong, in his commentary on article 902, C.N., has the following:

" 'The Code has desired to obviate perquisitions which might be unjust, odious, or, at all events, scandalous; it has wished to dry up at its source a stream of poisonous accusations against him who has passed under the protection of the tomb, or against her whom cupidity would despoil of deserved liberalities. Besides, there are cases where the remedy is worse than the evil. It would have been perilous to disturb the ashes of the dead by digging into the secret intimacies of their lives, or to blazon their weaknesses in the open day. * * * Better seal up in the tomb these errings which publicity can only make worse, and it is an ill thing to make war upon the memory of the dead for sordid gain.'

"The framers of our Code had before them this old French law, and the Ordinance of 1829, and the jurisprudence which had grown thereunder, and the attempt to perpetuate the same in the Code Napoleon, and they had before them the debates and discussions which that attempt had provoked; and there can be no doubt that *they deliberately adopted a middle course, restricting the incapacity to immovables, and substituting the word 'open' to the word 'notorious,' so that mere notoriety should not suffice, but absence of concealment or disguise should be requisite.* They fully appreciated the force of the objections which had been made, and the grave and unseemly scandals which resulted from permitting scrutiny into the private lives of

people who were dead and no longer able to defend themselves, the rehashing of scandalous rumors, and the unveiling of their weaknesses and faults; but at the same time they were impressed with the necessity, in the interests of public morals, of making some distinction between people who lived together as man and wife under the solemn sanction of marriage, *and those who maintained practically the same status, openly and publicly, without the sanction of marriage. They thought that such unambiguous, open, public, and shameless relations should be discouraged, and might be exposed without unnecessary invasion of the secrets of private life.* They thought that the judicial ascertainment of such unambiguous and acknowledged relations might be made without introducing any elements of inquisition into private affairs, based on scandalous rumors or inferences, or even upon suspicious acts. *For these reasons, they carefully and studiously confined the provision to 'those who have lived together in open concubinage,' meaning by the word 'open' that the concubinage should be so public as to be practically avowed, not necessarily by word, but at any rate by unambiguous, unequivocal, conduct; that the relations must be such that, when sought to be made the basis of judicial action, no odious inquisitions might be necessary, and no nice poising of testimony, as in this case.* * * *

*"At any rate, they hid their concubinage,* if such it, in fact, was, *under the cloak of an innocent relation, and to such a case article 1481, as already shown, does not apply."* (Italics ours.)

Counsel for the plaintiff contend that the Succession of Filhiol, 119 La. 998, 44 So. 843, is apposite here and decisive of the issue presented. There is also some intimation that this authority modifies or overrules the Jahraus Case, supra. From the facts found by the court, it appears that Filhiol was generally known to be living in concubinage with Inez Schmidt, whom he referred to as "his girl." They pretended to be married and adopted a fictitious name, and children were born of this illicit union. He maintained his principal establishment in Ouachita parish, while keeping her and the children in New Orleans. So, it is quite apparent that the facts in the Jahraus Case are different from those in the Filhiol Case and the instant one.

In the case of Toussant v. National Life & Accident Ins. Co., 147 La. 977, at page 983, 86 So. 415, 417, the court said:

"The Jahraus Case, 114 La. [456] 458, 38 So. 417, which interpreted this article as here stated, was not overruled by the Succession of Filhiol, 119 La. 998, 44 So. 843, invoked by plaintiff, but, on the contrary, was cited with approval. See 119 La. [998] p. 1005, 44 So. 843. In fact, the question in this Filhiol Case was not as to whether under said article 1481 the concubinage has to be open or secret; but it was as to whether it had been in that particular case open or secret. Moreover, two of the justices dissented, and one concurred in the decree only."

In the Filhiol Case, 119 La. 998, at page 1010, 44 So. 843, 847, the court said:

"The facts in the present case are entirely different from those disclosed in Succession of Jahraus."

In the case of Texada v. Spence, 166 La. 1020, 118 So. 120, 122, 62 A.L.R. 281, we said:

"Concubinage has a well-defined and well-understood meaning, both in an ordinary as well as in a legal sense. There can be no concubinage without a concubine, and there can be no concubine without a paramour. Webster's New Int. Dict. defines concubinage to be, 'The cohabiting of a man and a woman who are not legally married; the state of being a concubine.' Bouv. Law Dict., Rawle's Third Revision, p. 579, states: 'Concubinage is the act upon the part of the woman of cohabiting with a man without ceremonial marriage.' In Gauff v. Johnson, 161 La. [975] 977, 109 So. [782] 783, this court said: 'Concubinage is the act or practice of cohabiting in sexual intercourse without the authority of law or legal marriage.' If one of the parties in good faith lives with the other under the solemn sanction of what purports to be a legal marriage, though the marriage be null, as to the party in good faith it has the same effect as if it is not null. As to that party it has the ordinary effects of a valid marriage. Gauff v. Johnson, supra. *In Succession of Jahraus, 114 La. 456, 38 So. 417, this court recited the history of the expression 'open concubinage' as used in Civ.Code, art. 1481, and held that it meant a concubinage 'that is plain and above board, without secret, reserve, or disguise, and not merely one that is notorious.'*

"In the case before us, the elements required to constitute concubinage, much less open concubinage, were not present in the relation existing between the defendant, W. L. Spence, and the testatrix, Mrs. Mattie Texada Neal. The testatrix was not guilty of any moral wrong in living with the defendant. She lived with him openly as his wife, under the solemn sanction of what purported to be a legal marriage, and not as his concubine. There was nothing in her action obnoxious to the community or subversive of the public morals. The inhibition contained in the codal article is not intended to apply to such a situation. *The purpose of the law is to discourage a man and a woman from living together openly as husband and wife without a ceremonial marriage, in the interest of good morals, public order, and the preservation of society. Cole v. Lucas, 2 La.Ann. [946] 952."* (Italics ours.)

In the case of Jones v. Kyle, 168 La. 728, 123 So. 306, the testator was a white man engaged in a mercantile business. He named Amanda A. Kyle, a negress, as his universal legatee, designating her as "my cook." The nephews and nieces, claiming to be the legal heirs, sought to have the donation mortis causa reduced to one-tenth of the value of the estate under article 1481 of the Revised Civil Code, on the ground that the parties had lived in open concubinage. The evidence showed that from 1904 to 1908 they occupied adjoining rooms on his premises and thereafter she occupied a house built for her occupancy on his land, where they continued to live in concubinage until his death. The witnesses testified that on one occasion they found the

parties in bed cohabiting; that there were rumors and had been talk that their relations were not proper; and that he was keeping her. In holding that the concubinage was "not open" but secret, the court (168 La. 728, at page 733, 123 So. 306, 307) said:

"In Succession of Jahraus, 114 La. 456, 38 So. 417, this court had occasion to inquire into the meaning of 'open concubinage.' The court said that the word 'concubinage' described a status and not mere acts of fornication or adultery however frequent or even habitual; *that the word 'open' means free from concealment, reserve or disguise, not secret, but plain and aboveboard; that 'open concubinage' means one that is plain and aboveboard, without secret, reserve, or disguise,* not merely one that is notorious; *that 'the concubinage should be so public as to be practically avowed, not necessarily by word, but at any rate by unambiguous, unequivocal conduct;* that the relations must be such that, when sought to be made the basis of judicial action, *no odious inquisitions might be necessary,* and no nice poising of testimony.' * * *

"But be that as it may, the fact *remains that according to the preponderance of the evidence the deceased did not publicly avow his relations with the defendant, but on the contrary kept her in his employ ostensibly as cook and housekeeper and assistant in his store, and that their relations were not those of 'open' concubinage, but only of illicit intercourse and secret concubinage.* To fall under the ban of article 1481, R.C.C., *the concubinage must be* open." (Italics ours.)

Not only are the foregoing decisions correct from the standpoint of the announced public policy, but the view expressed in those cases in consistent and in accord with the proper grammatical analysis of the pertinent language of the article: "Those who have lived together in open concubinage." It will be noted that the important word "open" is an adjective, and, because of its position, modifies the noun "concubinage." If the court were to put the construction on article 1481 R.C.C. contended for by counsel for plaintiff, it would necessarily have to change the words to read: "Those who have openly lived together in concubinage. * * *" Now, it will be observed that the word "open" has been changed to the adverb "openly," modifying the verb "lived." If the words of the article had been so phrased by the Legislature, plaintiff's construction would be sound. However, as written by the lawmakers, plaintiff asks this court to strain and stretch the English language by a construction which would make the adjective "open" modify the verb "lived," a result contrary to the principles of the English grammar.

In every case in which the disguise, cloak, screen, sham, or pretense was effective in concealing from the public the concubinage, this court has held that the concubinage was *not open,* but closed or secret, and therefore article 1481 did not apply. In every case where the disguise, screen, cloak, or pretense was ineffective and the concubinage became generally known to the public or the parties avowed the relation, the court has uniformly held that it was *open* and *not closed* or *secret concu-*

*binage* and therefore article 1481, R.C.C., was applicable and controlling. Succession of Deubler, 139 La. 551, 71 So. 846; Succession of Filhiol, *supra*; Succession of Landry, 114 La. 829, 38 So. 575; Succession of Hamilton, 35 La.Ann. 640; Gibson v. Dooley, 32 La.Ann. 959; Layre v. Pasco, 5 Rob. 9; for other authorities see annotations under article 1481, Dart's La. Civil Code. For an interesting discussion of this subject, see, also, Tulane Law Review, Vol. 5, page 274.

In the case of People v. Salmon, 148 Cal. 303, 83 P. 42, 2 L.R.A.(N.S.) 1186, 113 Am.St.Rep. 268, the defendants had moved to Los Angeles and rented a room and lived together as husband and wife, under the assumed name of "Salmon." They were charged with the crime of living together "in a state of open and notorious cohabitation and adultery," each at the time being married to a person other than the codefendant. The evidence showed that no one knew their real names, or was suspicious that they were living together unlawfully, because they lived quietly and otherwise respectably. In holding that the parties were not guilty of a violation under the statute under which they were prosecuted, the court, in a unanimous decision, said:

"It will be noted that this statute does not punish secret adultery, which, from the moral aspect alone, is as grave an offense as known adultery. The object of the law, as pointed out by the decisions of all of the states where like statutes are found, is to prohibit the public scandal and disgrace of the living together of persons of opposite sexes notoriously in illicit intimacy, which outrages public decency, and has a demoralizing and debasing influence upon society. It is designed, as the Supreme Court of Iowa phrases it, 'To prevent evil and indecent examples, tending to corrupt the public morals.' State v. Marvin, 12 Iowa, 499; Searls v. People, 13 Ill. 597; State v. Crowner, 56 Mo. 147. In this state the distinction is drawn in People v. Gates, 46 Cal. [52] 53, where the conviction was for the same offense, and this court reversed the case, saying that, while the evidence tended to show that the defendant committed adultery with the woman named in the indictment, there was not the slightest proof of a living with her in a state of notorious adultery. 'The offense consists in living in a state of open and notorious cohabitation and adultery. The notoriety is as material in making out the offense as is the fact of adultery committed.' So it is the publicity of the offense, the demoralizing and debasing influence of the example that the law designs to prevent. State v. Marvin, 12 Iowa, [499] 506; State v. Johnson, 69 Ind. [85] 87. * * * Can it be said that a person, whose adulterous relationship is not only not known, but not even suspected is guilty of the open and notorious adultery made punishable by our law? It certainly cannot. Having regard to the very design of the law, which is to prevent an affront to society by such notorious practice, having regard to the uniform decisions of the law, that where the adulterous relationship is kept secret, even if it be continuous, the crime is not made out, it must be answered that the evidence fails to establish

the essential of notoriety, without which this particular offense is not proved. *The two kinds of cases most commonly found in charges of this kind are when John Doe and Jane Roe, known in the community not to be husband and wife, maintain an open, flagrant, and notorious sexual relationship without pretense of marriage or do the same thing under pretense of marriage, where the community knows the facts, and knows therefore that the pretense is false. In both of these cases there is the same affront to social decency and to the marital relation which is the basis of it. In this case, however, no such affront was put upon society. The couple were by all supposed to be married, and comported themselves with all the respect due to the marriage relation and to society."* (Italics ours.)

In Ruling Case Law, Vol. 1, at page 638, we find:

" * * * On the same principle clandestine acts of sexual intercourse, no matter how often repeated, do not constitute unlawful cohabitation, unless the parties openly and notoriously live together as paramour and concubine, habitually assuming and exercising towards each other the rights and privileges which belong to the matrimonial relation; no continuance of illicit intercourse makes out the crime so long as it is secret, but whenever secrecy is abandoned and the concubinage is open, the offense is complete; and so an adulterous relation which though continuance, is kept secret, *the community supposing the parties to be married, has been considered insufficient to sustain a con-*

*viction of living in a state of open and notorious cohabitation and adultery."* (Italics ours.)

In reading the history of the Codal article and the jurisprudence in connection therewith, there is impressed upon one's mind the fact that two important problems of public policy are involved: (1) The protection of public morals and decency by discouraging men and women from engaging in the *open,* public, and avowed relation of concubinage; and (2) to prevent scandals and injury to the reputation and character of a deceased party and the humiliation and embarrassment to his family by delving into his private affairs and life and desecrating his memory. The law-writers took a middle ground and avoided an extreme position with reference to these two important moral questions. They took into consideration the strong natural attraction of opposite sex. They also considered the weakness of people for material gain, which would tempt one to lay bare the secrets of deceased parties that would tarnish and blemish their good names and memories. The result was that the law-writers took a tolerant view—an attitude of "He that is without sin among you, let him first cast a stone. * * *" They drew the mantle of charity over the concealed or hidden mistakes and errors of a deceased party's private life. Thus, they only condemned those who had flaunted public decency and good morals, the inhibition not applying to those who secretly lived in concubinage. This liberality and tolerance is thoroughly demonstrated by the fact that the incapacity is not made absolute by the provisions of article 1481 of

the R.C.C., but only partial, for the parties to *open* concubinage are permitted under the express provisions of that article to make to one another a donation or bequest which does not exceed one-tenth part of the whole value of the estate. Consequently, if a white woman lived in *open concubinage* with a negro man—a revolting and repulsive affair—he or she would be entitled to receive from the other's estate, under a will, one-tenth of the value of the estate.

The last line of the article further shows the tolerant view of the framers of the Code, because, even those who live in open concubinage but afterwards marry are expressly "excepted from this rule."

To further emphasize the liberal and broad attitude taken by the law-writers on the subject, it will be remembered that the incapacity does not apply in the case where the concubinage is not open or public. The Supreme Court has recognized this important leniency feature of the article as will fully appear from the respective decisions of this court. See all authorities cited supra, and Sizeler v. Sizeler, 170 La. 128, 127 So. 388; Gauff et al. v. Johnson et al., 161 La. 975, 109 So. 782.

■ It must be borne in mind that this case does not present a question of individual conception or appreciation of what is good morals or decency—a general, complex, and unexplored field—but an interpretation of the provisions of article 1481 of the Revised Civil Code, in the light of its historical background and the decisions applying it—a well-defined subject. The conclusion is inescapable, since secret and closed concubinage is not condemned

by the article, that the penalty of incapacity was leveled solely and only at the openness or publicness of the illicit relation, by the flaunting of public decency and the setting of a bad example, and thereby corrupting the morals of the community. Open concubinage is an offense against society, so that, if a couple clandestinely and secretly live together so secretly and quietly and otherwise respectably, their wrongdoing is not publicly known, they do not come within the provisions of the article.

■ Various kinds of disguises have been utilized by parties to conceal the relation of concubinage—housekeeper, storekeeper, cook, maid, nurse, niece, sister-in-law, etc. Wherever the parties, by being discreet and secretive, have kept their relationship from being known, it has been held that the concubinage is closed and not open. However, in the instant case, it is said that because the disguise was that of marriage and the parties lived as husband and wife so that their friends, neighbors, acquaintances, the trades-people, and the public regarded them as such, that the concubinage was open or public. Marriage is a decent and lawful relation or status. The parties used it as a disguise. The fact that concealment of the concubinage was perfect is unquestionable in this case, because every one regarded these people as married or as husband and wife. They were never considered and known as paramour and concubine, and there was not even the slightest suggestion, rumor, or intimation that they were guilty of any wrongdoing, in fact, they were respected and highly regarded throughout the thirty-

five years that they lived together. Under the common law, the parties would be legally regarded and recognized as man and wife.

The plaintiff's argument is that concubinage means that a man and woman are living together as husband and wife without being married. Therefore, as the testator and Emma Stevens lived as husband and wife without being married, and were regarded by their friends and acquaintances and the public as being husband and wife, the concubinage was open. This reasoning is faulty and unsound, because secret concubinage represents a relation where the parties live as husband and wife without being married, but the article does not condemn such closed or secret concubinage, or the living together as man and wife. Consequently, in the instant case, the fact that the parties lived as husband and wife is only relevant to show that they did live in concubinage, but this certainly does not meet and satisfy the additional requirement of the law—that the concubinage must be open. In short, the public must know that, while the parties pretend to be married and are living in that relation, as a matter of fact, they are not married. These parties so scrupulously and meticulously maintained the appearance, the reputation, and the dignity of husband and wife for a period of more than a third of a century that even her own son, who lived with them, was unaware that they were not married. The result or conclusion is irresistable and inevitable that the concubinage was not open but closed and secret and, therefore, article 1481 is inapplicable.

For the reasons assigned, the judgment appealed from is annulled and set aside and the petition of Wm. J. Lannes, Sr., and the petition of intervention of William S. Day and Marie Day Matthews, against the defendant Emma Stevens, known as Mrs. Emile J. Lannes, be and they are hereby dismissed at their costs, and the case is remanded to the district court for further proceedings according to law and consistent with the views herein expressed.

ROGERS and ODOM, JJ., dissent.

O'NIELL, Chief Justice (dissenting).

The question in this case is whether article 1481 of the Civil Code, which forbids a couple who have lived together in open concubinage, without being afterwards married, to give or bequeath to one another anything but personal or movable property, and which even limits that to one-tenth of the value of the estate, is applicable to a case where an unmarried couple have lived together, openly, as man and wife, continuously, for thirty-five years, without making known the fact that they were not married.

The prevailing opinion here is that an unmarried couple, living openly as husband and wife, and hence living in concubinage, are not living in "open concubinage" if they conceal the fact that they are not married. That opinion is said to be founded, in some measure, upon the difference between "those who have lived together in open concubinage" and "those who have openly lived together in concubinage." It is conceded in the prevailing opinion that, if the Legislature, in adopting article 1481 of the Civil Code, had said "those who

have openly lived together in concubinage," etc., instead of saying "those who have lived together in open concubinage," etc., "plaintiff's construction [of the law] would be sound." I must confess that I do not see the difference between the meaning of the clause, "those who have lived together in open concubinage," and the meaning of the clause, "those who have openly lived together in concubinage." It is said in the prevailing opinion that, if the language were transposed, in the way suggested, the adverb "openly" would modify the verb "lived." It seems to me that, if the language were transposed thus, the adverb "openly" would qualify the adjective phrase, "in concubinage," or the whole clause, "lived together in concubinage." In other words, the adverb "openly" would describe how the living together in concubinage must be done in order to constitute "open concubinage." To speak of "those who have lived together in open concubinage" is the same as to speak of "those who have openly lived together in concubinage." Which reminds me that the redactors of the Civil Code were right when—in article 14—they gave the admonition that, in the construction of laws, we must not give too much attention to the niceties of the rules of grammar.

After referring to the decisions which are cited in the prevailing opinion in this case, it is impressed upon me that this is the first instance where the construction which the court is now giving to article 1481 of the Civil Code was ever suggested. In the Succession of Jahraus, 114 La. 456, 38 So. 417, and in fact in every case where this court has decided that the concubinage was not "open concubinage," the feature of the unholy affair that was not "open" was the living together, or cohabitation, not the fact that there was no marriage ceremony. The quotations which are given in the majority opinion in this case, from the Succession of Jahraus, and from the other decisions which are quoted or cited, do not seem to me to be appropriate to this case, because the question which is presented here was not before the court in the Succession of Jahraus, or in any other case referred to in the majority opinion in this case. For example, in Texada v. Spence, 166 La. 1020, 118 So. 120, 122, 62 A.L.R. 281, the question was whether article 1481 was applicable to a putative, ceremonial, but invalid, marriage; and the ruling was that, as the putative wife was in good faith when she contracted the marriage, she was not a concubine; and that a concubine was as essential to a state of concubinage as a ghost is to Hamlet. It was in that case that the court gave this striking declaration of the purpose of article 1481 of the Civil Code, viz.:

"The purpose of the law is to discourage a man and a woman from living together openly as husband and wife without a ceremonial marriage, in the interest of good morals, public order, and the preservation of society. Cole v. Lucas, 2 La.Ann. [946] 952."

In Cole v. Lucas, the purpose of article 1481 (then 1468) of the Civil Code was stated thus:

"The disabilities under which the law places persons who have lived in this condition, are created for the maintenance of

good morals, of public order, and for the preservation of the best interests of society."

In the Succession of Jahraus, the author of the opinion, being a French scholar, gàve the genesis and a brief history of article 1481 of the Civil Code; and he brought out the historical fact that, in the projet of the Code Napoleon, was proposed an article which was rejected, viz.: "Ceux qui ont vécu ensemble dans un concubinage notoire, sont respectivement incapables de se donner." It was said in the Succession of Jahraus that, by using the term "concubinage notoire," notorious concubinage, the intention was to adopt a more conservative doctrine than that which had prevailed under the old law, by applying the incapacity only to cases of notorious concubinage. But the code commission, remembering how the courts had been annoyed by scandalous *exposes* of men's secret affairs with women, rejected the proposed article, and left unrestricted donations between paramours and concubines. The article which·was proposed for the Code Napoleon was adopted, substantially in our so-called Civil Code of 1808, or "Digest of the Civil Laws in force in the Territory of Orleans," as article 10, Title 2, Book III, thus:

"Art. 10. Ceux qui ont vécu ensemble dans un concubinage notoire, sont respectivement incapables de se faire aucunes donations universelles, ou à titre universel, soit entre vifs on pour cause de mort."

In the French text the term "notorious concubinage" was used, but in the translation the term "open concubinage" was used, thus:

"Art. 10. Those who have lived together in open concubinage, are respectively incapable to make to each other any universal donation, or on an universal title, whether between inter vivos or mortis causa."

The language of the article, as translated, was very crude. Hence the commission appointed by the Legislature, in 1822, composed of Moreau Lislèt, Edward Livingston; and Pierre Derbigny, to revise the so-called Code of ·1808, proposed in their report, and in their projet for a new Civil Code, a revision of this article, with material changes. The revision and changes were adopted, exactly as recommended by the commission, as article 1468 of the Civil Code of 1825. In the French text, the word "notoire"—notorious—was omitted; so that the article declared, without qualification: "Those who have lived together in open concubinage are respectively incapable," etc. Here is the French text:

"Art. 1468.—Ceux qui ont vécu ensemble dans le concubinage, sont respectivement incapables de se faire, soit entre vifs, soit pour cause de mort, aucune donation immobilière; et, s'ils se font quelque donation mobilière, elle ne devra pas excéder la dixième partie de la valeur totale de leurs biens.

"Sont exceptés de cette disposition ceux qui viennent ensuite à se marier."

Comparing the French text of the proposed article, which is on p. 206 of Vol. 1 of the Report of the Commission, with the English text, which is on p. 199 of Vol. 2 of the Report of the Commission, we find that in the English text the com-

mission inserted the word "open" before the word "concubinage." The English text of the proposed article was adopted, verbatim, as article 1468 of the Code of 1825, and remains unchanged, as article 1481, in the revision of 1870.

I respectfully submit that, if there is any significance in the substitution of the word "open" for the word "notorious," notoire, the significance is that the redactors of this article of the Civil Code deemed it sufficient that the concubinage—or living together as man and wife—should be "open"—not concealed—in order to come within the purview of article 1481 of the Civil Code. In other words, they deemed it not necessary for the concubinage—or living together as husband and wife—to be notorious, in order for the concubinage to be "open concubinage," in the meaning of article 1481 of the Civil Code. The word "notorious" has an opprobrious sense. According to Webster's New International Dictionary it means: "Generally known and talked of; well, widely, or commonly known; forming a part of common knowledge; * * * universally recognized;—usually unfavorable in sense; as, a *notorious* thief, vice, fact." I respectfully submit, therefore, that when the law puts the ban upon "open concubinage," it goes a step further than when it puts it only upon "notorious concubinage."

Apropos the difference between "open concubinage" and "notorious concubinage" —if there is a difference—the reason why, in the case of People v. Salmon, 148 Cal. 303, 83 P. 42, 43, 2 L.R.A.(N.S.) 1186, 113 Am.St.Rep. 268, Salmon was not guilty of a violation of the California statute (St.

Cal. 1871–72, p. 381, § 2), declaring "open and notorious cohabitation and adultery" a felony, was that his offense was not notorious. The case being a prosecution for crime, the statute, of course, had to be construed strictly, and every element of the crime, as defined by the statute, had to be proved, in order to find the defendant guilty. In referring to the element of *notoriety,* the Supreme Court of California said: "Notoriety is the state or character of being well known, usually (and always when applied to crime) in an unfavorable sense. It is often found with words of similar import, such as 'open' and 'flagrant.'" Salmon and his female companion had come from New Jersey to Los Angeles, where they were unknown, and where they rented a room in a respectable lodging house, and occupied the room as man and wife, and were never suspected of living in a state of adultery. The court said that the purpose of the statute was to prevent evil and indecent examples, tending to corrupt public morals. But the difference between that case and this is that that was a criminal prosecution and the words of the statute were different. Hence I respectfully submit that the citing of the case in the majority opinion in this case is not persuasive.

My understanding of the dissertation in the opinion in the Succession of Jahraus is very different from that which is given in the prevailing opinion in this case. As I understand it, what the redactors of the Civil Code of Louisiana had in mind, when they required that concubinage had to be "open," in order to come under the ban of article 1481, was that there should be no

judicial investigation or peeping into the secret rendezvous, liaisons, or love nests of the men and women who sought to keep them hidden. It is not the marriage ceremony, or the want of a ceremony, but the relation of the couple, or their conduct towards each other, that is not to be inquired into, if they keep their secret.

It is observed in the prevailing opinion in this case that various disguises have been used successfully by concubines to conceal their status, e. g., housekeeper, storekeeper, cook, maid, nurse, sister-in-law, etc.; and that, in the cases where the parties have succeeded thus in concealing their illicit relation, it has been held that the concubinage was not open concubinage, in the meaning of article 1481 of the Civil Code. Hence it is reasoned that, if a concubine hides her relation with her paramour behind the disguise of *wife,* instead of housekeeper, storekeeper, cook, maid, nurse, or sister-in-law, the result ought to be the same. The answer to that is that the one and only *relation* which, if assumed falsely, constitutes *concubinage* is the relation of *husband and wife.* It is not *essentially* violative of article 1481 of the Civil Code, and hence not unconventional, for a woman to live in the same house with a man under the open but false pretense of being his storekeeper, housekeeper, cook, maid, nurse, or sister-in-law; but it is *essentially* violative of the article of the Civil Code, and hence very unconventional, for a woman to live in the same house with a man under the open but false pretense of being his wife.

I cannot imagine how an unmarried man and woman who are living together as husband and wife could inform their neighbors, when they move from one neighborhood into another, that they are not married. In introducing her to friends or visitors, he would be obliged, in all decency, to introduce her as his wife, or as Mrs. Himself, not as Miss So and so, or, if a widow, Mrs. So and so. He would never be expected to say: "I beg the honor of presenting my concubine." In her dealings with the local merchants, shopkeepers, or utility representatives, she would shock them if she referred to herself as the concubine of Mr. So and so, or if she referred to him as her paramour. I apprehend that the ruling in this case will put an end to the provisions of article 1481 of the Civil Code. It is well settled, by the decisions cited in the prevailing opinion in this case, that a paramour and concubine who succeed in concealing their cohabiting as man and wife are not guilty of living in *open* concubinage. Hence, if the paramour and concubine who are so bold in their cohabiting as man and wife that they deceive all of the neighbors into the belief that they are man and wife are not guilty of living in *open* concubinage, it is hard to imagine how a couple could live in *open* concubinage. If the ruling in this case is to prevail, article 1481 will have outlived its usefulness, or the spirit of the law will have fled, leaving only the dead letter.

We cannot know all that the lawmakers had in mind when they sought, many years ago, to discourage open concubinage. I doubt that it ever occurred to them that the term "open concubinage" might be construed as it is construed in this case. I prefer to believe that the Legislature real-

ized, even then, that marriage was a very sacred institution, the very keystone in the social structure, and should be safeguarded against simulation. I do not believe that concubinage was so prevalent in Louisiana, at the time when the first Civil Code was adopted, that the Legislature assumed that all men and women who might be living together under a false pretense of marriage should feel safe in the belief that only he that was without sin, among them, might first cast a stone.

I respectfully dissent from the prevailing opinion and decree in this case.